**Blair L. HORNSTINE, Plaintiff,**

v.

**TOWNSHIP OF MOORESTOWN, Moorestown Board of Education and Superintendent of Schools Paul J. Kadri, Defendants.**

No. CIV.A.03–CV–1953(FLW).

United States District Court,
D. New Jersey.

May 30, 2003.

Edwin J. Jacobs, Jr., Esq., Erika A. Appenzeller, Esq., Jacobs & Barbone, P.A., Atlantic City, NJ, Ira M. Fingles, Esq., Law Offices of Herbert D. Hinkle, Lawrenceville, NJ, for Plaintiff.

John B. Comegno II, Esq., Jennifer L. McCarthy, Esq., Susan S. Hodges, Esq., Archer & Greiner, Haddonfield, NJ, for Defendants.

Frances A. Hartman, Esq., Law Offices of the Attorneys Hartman, Chartered, Moorestown, NJ, for Intervenor.

## OPINION

WOLFSON, District Judge.

### I. INTRODUCTION

Plaintiff Blair Hornstine, a special needs high school senior, seeks the protection of

this Court by way of a Temporary Restraining Order ("TRO") to enjoin defendant Moorestown Board of Education ("the Board") from retroactively applying to her a proposed policy amendment that would allow the designation of multiple valedictorians, which she contends would discriminate against her under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act ("Section 504"). Although defendants granted plaintiff academic accommodations through her Individual Education Plan ("IEP") to redress her disability, as required by the Individuals with Disabilities in Education Act ("IDEA"), they now contend that those same accommodations granted plaintiff an unfair advantage over her non-disabled classmates; they allegedly aim to correct this "fundamental unfairness" by naming as valedictorian, together with, or instead of, plaintiff, a non-disabled student whose weighted grade point average ("GPA") is less than hers.

Given that this case has generated a firestorm of controversy, it is important to emphasize at the outset what this case is not about. First, it is not about whether plaintiff is disabled; that is undisputed by defendants. Second, it is not about the appropriateness of the accommodations plaintiff received through her IEP; she was afforded these accommodations by the Board to level the academic playing field for her, and in fact, her achievements are a model example of a successful IDEA program. This case is about an outstanding student who overcame the hardships of her disability to achieve the best grades in her class, and who is now in danger of having her accomplishments tarnished by her own school's administrators in the name of rectifying an imagined injustice. The record on this application for a TRO makes clear that the Board and Superintendent Paul Kadri ("Kadri"), in particular, apparently propelled by parental and community pressure, have sought to appease these uninformed interests by changing the rules. In so doing, they have embarked on a course to denigrate plaintiff's remarkable achievements as a special needs student, and thus, diminish the recognition due to her, by criticizing the accommodations which these same defendants approved and never challenged. This unfortunate set of circumstances leads me to issue the following opinion.

## II. FACTS AND PROCEDURAL HISTORY

Plaintiff Blair Hornstine is an exceptional student. After seven semesters in Moorestown High School, she has achieved the highest weighted grade point average in her class: 4.6894. Her high school transcript shows a remarkable 23 A+'s, 9 A's, 1 A-, and nothing lower. More than two-thirds of her classes were Advanced Placement ("AP") or Honors, which are by definition more intense than regular classes. She scored a 1570 out of a possible 1600 on her Scholastic Aptitude Test, and will attend Harvard University in the fall of 2003.

Plaintiff has earned these achievements in spite of the undisputed fact that she suffers from a physical disability. Because of this disability, the Board developed an IEP for her, as required by the IDEA, 20 U.S.C. §§ 1400—1491. See Complaint at ¶ 3. As part of her IEP, the Board granted her permission to participate in a hybrid program that allows her to attend morning classes and receive the remainder of her instruction at home from Board staff members. Id. It is undisputed that plaintiff needed this accommodation because her health problems caused "substantial fatigue" which rendered her unable to "attend [and] participate through a full school day." Certification of Paul J. Kadri ("Kadri Cert."), Exhibit D at page 4.

The 2002–2003 Moorestown High School Student/Parent Handbook ("Handbook"), incorporating Board policy, states that the graduating "senior student with the highest seventh semester [weighted G.P.A.] will be named the valedictorian, and the student with the second highest seventh semester [weighted G.P.A.] will be named the salutatorian." Complaint at Exhibit B. Thus, according to the Board policy now in effect, plaintiff should be named valedictorian of her class for the graduation ceremony on June 19, 2003, since she has attained the highest weighted G.P.A.

However, Superintendent Kadri has initiated an effort to change the Board policy to allow for multiple valedictorians and salutatorians. Kadri Cert. at ¶¶ 25–35. According to Kadri, in the fall of 2002—his first semester as superintendent—he was approached by "parents, students, and other community members" expressing concern that "students were not provided equal opportunities to earn the awards" because plaintiff was granted "accommodations ... in a disparate manner." *See id.* at ¶ 7. Kadri also alleges that he was told that plaintiff's father intended to manipulate the special education laws to ensure that his daughter became valedictorian. *Id.* at ¶¶ 8–9.

On September 19, 2002, Kadri met with plaintiff's father, Louis Hornstine. Kadri and Mr. Hornstine have very different recollections of this meeting. *Compare* Kadri Cert. at ¶¶ 10–24 *with* Louis Hornstine's Certification ("L. Hornstine Cert."), Plaintiff's Reply at Exhibit H, ¶¶ 12–24. Kadri portrays Mr. Hornstine as an overzealous parent bent on manipulating the system to ensure that his daughter does not suffer "the same embarrassment" he suffered when he was merely the salutatorian of his graduating class. Kadri Cert. at ¶ 14. Mr. Hornstine disputes most of Kadri's account of the meeting, stating, for example, that he was not salutatorian of his class, since his "class rank was never that high." L. Hornstine Cert. at ¶ 19. Plaintiff offers the certification of Assistant Superintendent Judithann Keefe, who was also present at the meeting, in support of Mr. Hornstine's account. Certification of Judithann C. Keefe, Ed.D. ("Keefe Cert.").

However, the Court will not involve itself in the apparent quarrel between Mr. Kadri and Mr. Hornstine because it is not relevant to this case. It is undisputed that Mr. Hornstine could not affect his daughter's curriculum in any way without the express authority of the School Board. *See Lascari v. Bd. of Ed. of Ramapo Indian Hills Regional High Schl. Dist.*, 116 N.J. 30, 44, 560 A.2d 1180 (1989) (stating that the local school district is vested with the responsibility of formulating and implementing special needs students' IEPs); N.J.S.A. 18A:46–5 and –5.1. Thus, whether or not Mr. Hornstine intended to manipulate the system is immaterial: the Board approved every aspect of plaintiff's curriculum through her IEP.

In any event, in the fall of 2002, Kadri began an "investigat[ion]" into plaintiff's disabled status and attendant course load. Kadri Cert. at ¶ 25. On November 20, 2002, Kadri was present at a meeting with plaintiff, her IEP team, and her parents. Complaint at ¶ 9. Plaintiff's treating physician and the IEP team agreed that due to her medical condition at the time, a reduction in the number of her courses was necessary. *Id.* at ¶ 8. Yet Kadri ordered that the school physician review plaintiff's medical condition. *Id.* at ¶ 9. The school physician agreed that a "reduction in course load is medically appropriate due to her exhaustion and overextending herself this year." *Id.* at Exhibit A. Kadri, however, refused to allow plaintiff to drop a class. She instead withdrew from AP European History and enrolled in Honors Contemporary U.S. History. *See* L.

Hornstine Cert. at ¶2, and Kadri Cert. at Exhibit B.

In the fall of 2002 and early 2003, Kadri held impromptu meetings with the Board attorney, the Child Study Team, and supervisors within the school system to discuss plaintiff's IEP and disability status, G.P.A., and valedictorian status. Complaint at ¶12. In December 2002, the Board contacted plaintiff's home instructors to "validate and verify" her educational curriculum. *Id.* at ¶13; Steven Grill's Certification ("Grill Cert."), Plaintiff's Reply at Exhibit B, ¶9; John O'Neill's Certification ("O'Neill Cert."), Plaintiff's Reply at Exhibit E, ¶7. Plaintiff alleges, and one of her home instructors certifies, that the Board did not inquire into the curricula of other home-schooled students. Complaint at ¶13; O'Neill Cert. at ¶8.

Moreover, Kadri has made his desire to award multiple valedictorians public knowledge among plaintiff's classmates. In January 2003, at a dinner meeting with the school's class officers, he discussed the possibility of declaring multiple valedictorians. Furthermore, in late February 2003, he addressed the same issue to an assembly of the entire senior class, while plaintiff was present. Complaint at ¶¶14,17.

In the last few weeks, Kadri has placed a proposal before the Board that its policy be amended to allow for multiple valedictorians. Kadri Cert. at ¶35. The proposed amendment to the policy reads:

> In determining the recipients of [the awards of valedictorian and salutatorian], the Board may review the program of study, manner of instruction, and other relevant issues, and in its discretion, with the assistance of the administration, may designate multiple valedictorians and/or salutatorians to ensure that all students have an equal opportunity to compete for these awards.

*Id.* That amendment received a public reading on May 1, 2003, and, while the Board was not scheduled to vote on the proposal until May 12, Kadri sent a letter on May 6 to K.M., the non-disabled classmate who defendants apparently wish to name as valedictorian along with, or instead of, plaintiff, informing him that he "certainly will be considered for the valedictorian award." K.M.'s Motion to Intervene at Exhibit A. While K.M. is an extremely gifted student, it is undisputed that his weighted G.P.A. at the end of the seventh semester was lower than that of plaintiff.[1] Moreover, despite plaintiff's higher weighted G.P.A., Kadri did not send her a similar letter informing her that she will be considered for the valedictorian award.

Kadri does not disguise the fact that the proposed policy amendment to award multiple valedictorians is directed at plaintiff. In his certification, he avers that the current policy of awarding the student with the highest weighted G.P.A. the title of valedictorian is unfair as applied to plaintiff's graduating class because other students "were not afforded the accommodations which [p]laintiff enjoyed." *Id.* at ¶34. Specifically, Kadri contends that "[p]laintiff was able to earn more 'weighted' grades" than her "regular education peers" because of the "availability of many AP courses in her home instruction program, and she was also able to secure higher grades in her home instruction classes than students enrolled in the same courses at Moorestown High School." *Id.* at ¶32, 26. Kadri questions the experience of plaintiff's AP home instructors, and contends that the home instructors "did not confer with Moorestown High School AP teachers regarding grading or implement the same grading system." *Id.* at ¶29. He further claims that, on occasion, when plaintiff realized she would not

---

1. K.M.'s transcript was submitted under seal to protect his privacy interests.

be able to secure a high grade in a difficult in-school class, she either withdrew from the class or sought home-school instruction. *Id.* at ¶ 28. He also suggests that plaintiff's father hand-selected her home instructors. *Id.* at ¶ 29. Lastly, Kadri asserts that plaintiff gained an unfair advantage over her non-disabled classmates because she was not required to take physical education, and was instead able to enroll in a higher-weighted course. *Id.* at ¶ 30.

Plaintiff strongly disputes Kadri's contentions. Before plaintiff was allowed to enroll in any home instruction course, the Board approved the curriculum of the course and the home instructor. *See* Plaintiff's IEP, Complaint at Exhibit A. Plaintiff's IEP specifically states that "standard grading practices will apply" and "grading in Home Instruction classes will be determined by the Home Instructor in conjunction with the regular class teachers." *Id.;* L. Hornstine Cert. at ¶ 4. In fact, in one of plaintiff's home instruction courses, AP Calculus, she was required to take chapter tests graded by her home instructor as well as the same mid-term exam as her non-disabled classmates, graded by the in-school instructor. Connie Nothdurft's Certification ("Nothdurft Cert."), Plaintiff's Reply at Exhibit C, ¶¶ 5–10. Plaintiff received an A+ on the in-school exam, and an A average on her home instructor's tests. Her home instructor stated in a certification that "[i]n retrospect, perhaps my grading is actually more rigorous than the school's own" grading. *Id.* at ¶ 10.

With respect to Kadri's allegation that plaintiff withdrew from in-school classes in order to protect her high G.P.A., plaintiff notes that she withdrew from two classes,

with the school's permission and, in both cases, withdrawing actually *lowered* her G.P.A. L. Hornstine Cert. at ¶ 2. For one of the classes from which she withdrew, the record contains evidence that the school's own physician agreed with plaintiff's IEP team and treating physician that such a reduction in course load was medically necessary. Plaintiff's IEP, Complaint at Exhibit A. Similarly, plaintiff waived out of physical education because her physician determined it was necessary. *See* Kadri Cert. at ¶ 22.

Despite Kadri's implication that plaintiff's father hand-picked her home instructors, Mr. Hornstine responds that the only teacher he referred was Mr. O'Neill, plaintiff's Latin teacher, because no Latin teacher at the school was willing to teach home-bound students. L. Hornstine Cert. at ¶ 6. The Board approved Mr. O'Neill's appointment. *Id.* Furthermore, it is of no moment whether Mr. Hornstine had suggested one, several, or all of his daughter's homebound instructors since the Board had the exclusive authority to approve and hire these instructors and did so in each case.

In addition, while Kadri claims that, unlike her "regular education peers," plaintiff "could take as many AP or Honors courses as she wanted to," plaintiff cites two examples of situations in which her special education status actually prevented her from taking AP or Honors courses. L. Hornstine Cert. at ¶ 10. The school would not allow her to receive home instruction for AP Biology because it could not provide for the lab component. *Id.* Similarly, the school could not find a suitable home instructor for Honors National Government, so plaintiff had to take the unweighted standard course "You and the Law."[2] *Id.*

---

2. This switch occurred at the beginning of the January 2003 semester. L. Hornstine Cert. at ¶ 10. The Court notes that the January 2003 semester is the eighth semester, not considered in the school's current policy for determining valedictorian. This switch, nonetheless, buttresses plaintiff's assertion that she

Moreover, a comparison of plaintiff's transcript with that of K.M. reveals that he had a mathematical advantage over plaintiff. Statistically, he took more weighted courses than plaintiff. In the four years at Moorestown High School, plaintiff took 8 AP courses whereas K.M. took 10, and plaintiff took 15 Honors courses while K.M. took 12. AP courses are weighted more heavily than Honors courses. An AP class is worth one grade point more than a standard class, and an Honors class is worth one-half grade point more than a standard class. For example, an A+ in standard Latin is a 4.3; an A+ in Honors Latin is a 4.8, and an A+ in AP Latin is a 5.3. Since K.M. completed 2 more AP courses than plaintiff, and she completed only 3 more Honors classes than he, compared to him, plaintiff was at a weighted course disadvantage.

In a strained and relentless effort to further show that plaintiff's accommodations gave her an unfair advantage over her non-disabled classmates, Kadri submitted a late supplemental certification on May 7, 2003, one day before the TRO hearing. Paul J. Kadri's Supplemental Certification ("Kadri Supp. Cert."). Kadri makes numerous re-calculations of plaintiff's weighted G.P.A. to reflect hypothetical curricula for plaintiff had she been a non-disabled student and required to take an in-school curriculum. He even provides as an illustration a *faux* transcript for plaintiff (and assures the Court that the Board does not intend to submit the transcript to any college or university). *Id.* at ¶ 12 and Exhibit C. The end result of his series of conjectures is that plaintiff's re-calculated G.P.A. would have been lower than K.M.'s—by five *thousandths* of a point. *Id.* at ¶¶ 12–13. The fact that Kadri's speculative calculations, theoretical curricula, and hypothetical alternative transcript can produce only a .005 differ-

ence between the top two students highlights the weakness of defendants' position and the lengths to which Kadri is prepared to go to deny plaintiff sole valedictorian status to appease the Moorestown community. Furthermore, Kadri fails to mention the salient fact that, in reality, K.M., who was not afforded any of the accommodations given to plaintiff, nonetheless had a statistical *advantage* over her in terms of the weighted courses taken by both students.

In his continued effort to denigrate plaintiff's accomplishments, Kadri notes that he has "reviewed the transcripts of the past six valedictorians, and none of those students earned straight A+ grades, like Plaintiff received during her junior year." *Id.* at ¶ 10. He is referring to plaintiff's junior year accomplishment of earning an A+ in all ten of her classes. Instead of applauding plaintiff's achievements, he insinuates that since no valedictorian in the past six years was able to achieve grades as high as plaintiff did in her junior year, then plaintiff's success must be due to some unfair advantage.

The Board and Superintendent Kadri have made clear that they have no intention of allowing plaintiff to be the sole valedictorian, even though she has earned the highest weighted G.P.A. after seven semesters. Worse yet, the fact that Kadri informed K.M.—and not plaintiff—that he was being considered for the award raises the possibility that the Board may not select plaintiff for the honor at all. Indeed, the proposed policy amendment is vague enough to allow the Board to avoid naming the student with the highest seventh semester weighted G.P.A. as one of the valedictorians. Perhaps with this possibility in mind, defense counsel at oral argument did not state on the record that

was constrained in her selection of AP courses.

the Board definitely would name plaintiff one of the valedictorians.

To prevent the Board from retroactively applying the proposed amendment, plaintiff filed an Application for Emergent Relief with the Director of the New Jersey Department of Education—Office of Special Education on April 17, 2003, seeking a due process hearing. Complaint at Exhibit F. By way of letter dated April 22, the Office of Special Education denied plaintiff a hearing for lack of jurisdiction. *Id.*

On May 1, 2003, plaintiff filed a verified complaint in this Court, seeking injunctive relief and money damages against the Township of Moorestown,[3] the Moorestown Board of Education, and Superintendent Kadri, for the following causes of action: invasion of privacy under the Family Education Rights and Privacy Act ("FERPA"), violation of the Americans with Disabilities Act ("ADA"), the Rehabilitation Act of 1973, the New Jersey Law Against Discrimination ("NJLAD"), 42 U.S.C. § 1983, procedural and substantive due process rights, and denial of equal protection. Also on May 1, plaintiff filed an Order to Show Cause seeking a TRO enjoining defendants from naming multiple valedictorians, and defendants submitted their opposition.

On the same day, this Court scheduled a hearing for May 8 and permitted the parties to submit additional briefing. The parties submitted supplemental briefing and certifications. Defendants also filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) on procedural grounds. Additionally, K.M. filed a motion to intervene and a motion for adjournment.

The Court held oral argument on May 8, at the close of which the Court read an oral opinion into the record, which granted K.M.'s motion to intervene, denied K.M.'s motion for adjournment, granted plaintiff's TRO, and denied defendants' motion to dismiss.[4]

## III. DEFENDANTS' MOTION TO DISMISS IS DENIED.

On May 5, 2003, defendants filed a motion to dismiss plaintiff's complaint in its entirety based upon alleged procedural deficiencies. Specifically, defendants maintain that: (i) this matter is the subject of a Tort Claims Notice and is barred by N.J.S.A. 59:8-8; (ii) since the Board had not taken final action, plaintiff's claims are not ripe for review because no justiciable case or controversy exists; (iii) plaintiff has failed to exhaust her administrative remedies; and (iv) pursuant to FED. R. CIV. P. 19, plaintiff has failed to name an indispensable party. Before addressing the merits of defendants' motion, I find that the intervention of K.M. renders defendants' contention that plaintiff has failed to name an indispensable party moot. I will now rule on the remainder of defendants' motion to dismiss.

### A. Plaintiff's Constitutional Claims Are Not Barred by Their Inclusion in the Tort Claims Notice Filed by Plaintiff Pursuant to N.J.S.A. 59:8-8.

The New Jersey Tort Claims Act Against Public Entities does not bar plaintiff from going forward on her federal claims. The Tort Claims Act provides:

A claim relating to a cause of action for death or for injury or damage to a person or to property shall be presented as provided in this chapter not later than the ninetieth day after accrual of the cause of action. After the expiration of six months from the date the notice of

---

3. Plaintiff has since dismissed her claims against the Township of Moorestown.

4. At that time, the Court reserved its right to file a more formal written opinion, pursuant to L.R. CIV. P. 52.1.

claim is received, the claimant may file suit in an appropriate court of law.

N.J.S.A. 59:8–8. On April 3, 2003, plaintiff served on the Board a Tort Claims Notice, pursuant to N.J.S.A. 59:8–7, asserting claims against Superintendent Kadri, both individually and in his official capacity, the Board, and the Moorestown School District. Kadri Cert. at Ex. C. Therein, plaintiff stated that:

Mr. Kadri and other members of the Board of Education ... made a concerted effort ... to violate the claimant's legal rights under the following federal and state statutes and constitutional provisions among others: Family Educational Rights and Privacy Act, Individuals with Disabilities in Education Act, Civil Rights Act ... and the guarantees to procedural due process and equal protection of the laws of the Fourteenth Amendment to the United States Constitution.

*Id.* at p. 6. Plaintiff asserts damages in the amount of $2,700,000.00. Kadri Cert. at ¶ 36.

Defendants contend that plaintiff is barred from pursuing the instant action by virtue of the six month repose mandated by service of the Tort Claims Notice. Specifically, defendants maintain that the claims asserted in the instant action "mirror" the claims set forth in the Notice and, thus, are premature because plaintiff has failed to wait the statutorily-imposed six month period for investigation and preparation. Defendants assert that the instant action therefore should be dismissed.

While defendants acknowledge this district's decision in *Peltack v. Borough of Manville,* 547 F.Supp. 770 (D.N.J.1982), which held that the Tort Claims Act's six month period of repose did not preclude plaintiff's civil rights action, defendants contend that *Peltack* does not apply in the instant action because it is unclear whether the plaintiff there included federal claims in his Notice of Tort Claim. In this connection, defendants state that because the plaintiff here "has in fact included both state and federal claims in the Notice of Tort Claim ... and thereafter sues on the exact claims before the six month period required by the statute has expired, the claims must be procedurally barred."

Defendants' reading of *Peltack* is erroneous. In *Peltack,* the plaintiff filed a Notice of Tort Claim, pursuant to N.J.S.A. 59:8–8, asserting violations of his constitutional right to due process. *Id.* at 772. Approximately two months later, when plaintiff filed a federal civil rights suit in the District of New Jersey, defendants moved to dismiss plaintiff's claim for failure to adhere to the six month repose mandated by the Tort Claims Act. Making clear that federal claims cannot be impaired by state statutory requirements, the court ruled that the six month period of repose does not attach to a federal civil rights suit, stating: "[t]o incorporate the procedural provisions of the state statute borrowed for one purpose would unduly infringe upon the assertion of federally created rights." *Id.* at 773 (citing *Gipson v. Twp. of Bass River,* 82 F.R.D. 122, 126 (D.N.J.1979); *Paschall v. Mayone,* 454 F.Supp. 1289, 1298 (S.D.N.Y.1978)). *See also Fuchilla v. Layman,* 109 N.J. 319, 331, 537 A.2d 652 (1988) (recognizing that New Jersey's Tort Claims Act notice provision cannot bar federal claims); *Schneider v. Simonini,* 163 N.J. 336, 372, 749 A.2d 336 (2000) (same).

In addition, defendants failed to note the United States Supreme Court decision in *Felder v. Casey,* 487 U.S. 131, 134–38, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988), which held that state tort claims acts cannot impinge upon federal rights brought under 42 U.S.C. § 1983. Defendants also did not cite this District's decision in *Forcella v. City of Ocean City,* 70 F.Supp.2d 512, 514

(D.N.J.1999), which held that the Tort Claims Act notice provision does not bar claims brought under the New Jersey Law Against Discrimination. Since the Tort Claims Act is totally inapplicable to federal and NJLAD claims, so too, it is immaterial whether plaintiff delineated her federal claims in her tort claims notice. Therefore, contrary to defendants' assertions, plaintiff's federal and NJLAD claims may proceed.

## B. Justiciability

■ The exercise of judicial power depends upon the existence of a "case or controversy" under the United States Constitution Article III, Section 2. *DeFunis v. Odegaard*, 416 U.S. 312, 316, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974). The following factors are to be considered in determining whether plaintiffs can meet the Constitutional requirements of standing:

1. The plaintiff must have suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;

2. There must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant and not the result of the independent action of some party not before the court; and

3. It must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Society Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176 (3d Cir.2000). Consistent with current policy, the Board should name plaintiff the sole valedictorian of her senior class. Instead, defendants have stated an intention to amend that policy and apply it retroactively to diminish plaintiff's accomplishments. Further evidencing the Board's intention is the let-

ter Kadri sent to K.M. on May 6, 2003, informing him that he is "certainly" being considered for the multiple valedictorian award. K.M.'s Motion to Intervene at Exhibit A. These actions demonstrate that plaintiff is in imminent danger of being discriminated against in violation of her rights under the ADA and Section 504 of the Rehabilitation Act. Her threatened injury would be redressed by the granting of this TRO. Thus, plaintiff has standing to pursue this action.

■ In addition to standing, plaintiff's "case or controversy" must be ripe for adjudication. *Artway v. Attorney General of the State of N.J.*, 81 F.3d 1235, 1246–47 (3d Cir.1996). "The basic rationale of the ripeness requirement is 'to prevent the courts, through the avoidance of premature adjudication, from entangling themselves in abstract disagreements.'" *Id.* (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). While defendants maintain that this action is not ripe because the Board has yet to issue a decision regarding the valedictorian awards for the class of 2003, their actions belie their contention.

At a Board meeting on May 1, 2003, there was a public reading of the proposed amendment to confer multiple awards, with a May 12 scheduled date for voting on the policy change. Additionally, plaintiff did not receive a letter similar to that sent by Kadri to K.M. on May 6, 2003. Albeit Kadri's notice to K.M. is a transparent attempt to confer standing to intervene on this student, this correspondence also reflects that the Board is doing more than merely considering the proposed amendment. Rather, it intends to enact the new policy and apply it retroactively to the class of 2003, to the detriment of plaintiff. Moreover, at the hearing on this TRO application, defendants said nothing to contradict that conclusion. Thus, defen-

dants' actions during the week of May 5, 2003 eliminated their ripeness argument.

## C. Exhaustion of State Administrative Remedies

Defendants contend that plaintiff's claims should be dismissed for failure to exhaust state administrative remedies. Before discussing the substance of defendants' argument, the Court notes that defendants did not adequately brief this issue in their opposition or supplemental papers. The Court will nonetheless thoroughly consider this issue out of respect for the state administrative forum and a desire for judicial comity.

The Commissioner of Education enjoys broad authority under N.J.S.A. 18A:6–9 to hear "all controversies and disputes arising under the school laws," N.J.S.A. 18A:6–9; see Balsley v. North Hunterdon Reg. Schl. Dist. Bd. of Ed., 117 N.J. 434, 438, 442, 568 A.2d 895 (1990). The Board argues that the question of whether a public school student should be awarded the honor of valedictorian under a school board's policy is an "entirely local" issue, and therefore, that a remand to the Commissioner would be appropriate. If plaintiff were only challenging the Board's application of its policy, defendants would likely be correct in their assertion. See

T.M. v. Mercer County Junior & Senior High Schl., OAL Dkt. No. EDS 4317–02S, 2002 WL 1589870 (June 21, 2002) available at http://www.lawlibrary.rutgers.edu/oaldecisions/initial/eds04317–02 1 .html (visited May 5, 2003) (Department of Education ruling on applicability of school district policy). However, in this case, plaintiff's challenges involve more than the mere application of a school board policy. Plaintiff's verified complaint pleads several causes of action—discrimination under the ADA and Rehabilitation Act, procedural and substantive due process under the First, Fourth, Ninth and/or Fourteenth Amendment of the U.S. Constitution, equal protection under the Fourteenth Amendment, and discrimination under the New Jersey Law Against Discrimination.[5] As remedies, she seeks both injunctive relief and damages. Thus, while her request for injunctive relief focuses on the retroactive application of the proposed Board amendment to her, and whether it is grounded in discrimination, her requests for damages implicate additional allegations of disability-based discrimination apart from the amendment and the awarding of valedictorian status.

Both the plain language of N.J.S.A. 18A:6–9 and New Jersey case law compel

---

**5.** Plaintiff has also brought an invasion of privacy claim under the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g. The Supreme Court has held, however, that there is no private right of action under this Act. See Gonzaga Univ. v. Doe, 536 U.S. 273, 290, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002). Therefore, this claim will not be considered for the purposes of this exhaustion analysis.

In addition, based on the parties' briefing and comments in a teleconference held on May 6, 2003, the Court does not construe paragraph 23 of Count One in plaintiff's complaint to set forth causes of action based on defamation, breach of contract, or violation of the non-disclosure provisions of N.J.A.C. 6A:14–1.1—6A:14 App. E. Rather, the Court construes these references in paragraph 23 as

underlying plaintiff's discrimination claim under the Rehabilitation Act. Compare Complaint at ¶ 23 ("The actions by defendant Paul J. Kadri have defamed Plaintiff Blair L. Hornstine, invaded her right to privacy as set forth in the Family Education Rights and Privacy Act, 20 U.S.C. § 1232g, et seq. [sic] and N.J.A.C. 6A:14–1.1 et seq. [sic], breached her educational contract, violated all non-disclosure provisions as set forth in N.J.A.C. 6A:14–1.1, et seq. [sic], and ignored the rules and regulations promulgated by Defendant Moorestown Board of Education in selecting a valedictorian.") with Complaint at ¶ 26 ("The aforementioned conduct of defendant Paul J. Kadri constituted discrimination in violation of the Rehabilitation Act of 1973.").

the conclusion that the Commissioner does not have jurisdiction over plaintiff's myriad claims. Because none of plaintiff's claims "aris[e] under the school laws" of New Jersey, it follows that N.J.S.A. 18A:6–9 does not grant the Commissioner authority to adjudicate the types of claims raised here. New Jersey case law further supports this literal interpretation of N.J.S.A. 18A:6–9. For example, the court in *Picogna v. Bd. of Ed. of the Twp. of Cherry Hill*, 249 N.J.Super. 332, 592 A.2d 570 (App.Div. 1991), addressed the Commissioner's authority under N.J.S.A. 18A:6–9 to adjudicate a breach of contract claim brought by a public school employee. In rejecting the argument that the Commissioner was authorized to hear the claim because it was related to school laws and personnel, the Court employed a literal interpretation of N.J.S.A. 18A:6–9 to conclude that the Commissioner does not have authority to hear these sorts of claims. *Id.* at 335, 592 A.2d 570 ("Whether the petitioner's employment was wrongfully terminated under the contract ... is for the court, not the Commissioner, to decide."). Similarly, the court in *Galbraith v. Lenape Reg. High Schl. Dist.*, 964 F.Supp. 889 (D.N.J.1997), concluded that "the Commissioner of Education is not competent to decide [New Jersey Law Against Discrimination] or breach of contract claims since the claims do not 'arise under the school laws.'" *Id.* at 895. This Court sees no reason why the literal interpretation employed by these courts would not apply to each of plaintiff's claims here.[6] Accordingly, the Commissioner of Education does not have jurisdiction under N.J.S.A. 18A:6–9 to hear plaintiff's claims.

 Rejection of defendants' exhaustion argument is further grounded in case law governing federal claims brought by students entitled to protection under the IDEA. There are no state exhaustion requirements for actions brought under the ADA or Section 504 of the Rehabilitation Act, or under 42 U.S.C. § 1983 to enforce a federal constitutional claim. *See Jeremy H. v. Mount Lebanon Schl. Dist.*, 95 F.3d 272, 281–82 (3d Cir.1996) (ADA and Rehabilitation Act claims); *Hochman v. Bd. of Ed.*, 534 F.2d 1094, 1097 (3d Cir.1976) (section 1983 claims). However, in cases in which it appears that a plaintiff has cloaked an IDEA claim as an ADA, Rehabilitation Act, or Section 1983 action in an effort to avoid application of the IDEA's distinct exhaustion requirement, courts will require that plaintiff to exhaust the state administrative remedies mandated for IDEA claims. *Jeremy H.*, 95 F.3d at 281–82. Courts look unfavorably upon plaintiffs and attorneys who employ this strategy because it undermines Congress' goal of providing comprehensive protections and benefits for disabled students under the IDEA. *Rose v. Yeaw*, 214 F.3d 206, 209 (1st Cir.2000); *O'Hayre v. Bd. of Ed. Of Jefferson Cty.*, 109 F.Supp.2d 1284, 1292 (D.Colo.2000).

---

**6.** This holding is not in conflict with the New Jersey Supreme Court statement in *Balsley v. North Hunterdon Reg. Schl. Dist. Bd. of Ed.*, that the Department of Education has jurisdiction to hear discrimination cases brought by public school students or employees under N.J.S.A. 18A:6–9. As implicitly recognized by that Court, the Commissioner has jurisdiction to hear only those discrimination cases brought under New Jersey education law N.J.S.A. 18A:36–20, which prohibits discrimination in the obtaining of "any advantages, privileges or courses of study of the school by reason of race, color, creed, sex or national origin." *See Balsley*, 117 N.J. at 441–42, 568 A.2d 895. *See also Jenkins v. Morris Tp. Schl. Dist.*, 58 N.J. 483, 279 A.2d 619 (1971); *Booker v. Plainfield Bd. of Ed.*, 45 N.J. 161, 212 A.2d 1 (1965) (racial segregation cases). Disability-based discrimination claims, such as those presented here, are noticeably absent from the types of claims listed in N.J.S.A. 18A:36–20 and, therefore, are not within the Commissioner's jurisdiction.

■ To determine whether a plaintiff should be subjected to the IDEA's exhaustion requirement, courts focus on whether the relief sought by the plaintiff is available under the IDEA.[7] *See, e.g., W.B. v. Matula,* 67 F.3d 484, 496 (3d Cir.1995). While seemingly simple, this analysis can become complex in disability-based discrimination cases because of the significant overlap between the IDEA, the ADA, and the Rehabilitation Act. *See Weixel v. Bd. of Ed. of the City of New York,* 287 F.3d 138, 150–51 (2d Cir.2002) (analyzing whether complaint alleging discrimination in denial of admittance into honors-level placement also stated IDEA claim for inappropriate educational placement). This Court has been spared from such delicate dissection in this case, however, because defendants do not argue that plaintiff's harm could be redressed by the IDEA, nor does it appear that such an argument would be meritorious.

The IDEA focuses on the appropriateness of the public education afforded special needs students whereas both the Rehabilitation Act and the ADA focus on disability-based discrimination against special needs students and are intended to reach "grosser kinds of misconduct" than the IDEA. *Timms v. Metrop. Schl. Dist. of Wabash Cty., Indiana,* 722 F.2d 1310, 1318

(7th Cir.1983). *See Walker v. Dist. of Columbia,* 157 F.Supp.2d 11, 36 (D.D.C.2001) (affirming this principle); *A.W. v. Marlborough Co.,* 25 F.Supp.2d 27, 31–32 (D.Conn.1998) (same). *See also N.L. v. Knox Cty. Schls.,* 315 F.3d 688, 695 (6th Cir.2003) (noting distinction between the IDEA and the Rehabilitation Act); *McGraw v. Bd. of Ed. of Montgomery Co.,* 952 F.Supp. 248, 252–54 (D.Md.1997) (analyzing separately plaintiff's same allegations under the IDEA and, together, the ADA and the Rehabilitation Act). The ADA and Rehabilitation Act provide relief from discrimination while the IDEA provides relief from inappropriate educational placement decisions, regardless of discrimination. *J.D. v. Pawlet Schl. Dist.,* 224 F.3d 60, 70 (2d Cir.2000); *Sellers v. Schl. Bd. of the City of Manassas,* 141 F.3d 524, 528–29 (4th Cir.1998); *A.W.,* 25 F.Supp.2d at 31. This distinction is illustrated in the instant case by the fact that plaintiff was afforded the key benefit secured by the IDEA—a free, appropriate public education-yet she will be precluded, on account of her disability, from fully enjoying a benefit she rightfully earned unless this Court grants the requested relief. She has not linked her request to be named sole valedictorian, nor her request for damages, with the accommodations to which she was entitled under the IDEA.[8]

---

**7.** This inquiry is rooted in the text of the IDEA, which explains that

Nothing in [the IDEA] shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, Title V of the Rehabilitation Act of 1973, or other federal laws protecting the rights of children with disabilities, *except that before the filing of a civil action under such laws seeking relief that is also available under [subchapter II of the IDEA], the procedures under subsections (f) and (g) of this section shall be exhausted* to the same extent as would be required had the action been brought under this subchapter.

*See, e.g., Frazier v. Fairhaven Schl. Comm.,* 276 F.3d 52, 59 (1st Cir.2002) (quoting 20 U.S.C. § 1415(i)(2)) (alterations in original). *See also Susan N. v. Wilson Schl. Dist.,* 70 F.3d 751, 763 (3d Cir.1995) ("[This section] was enacted to reaffirm the viability of section 504 [of the Rehabilitation Act], 42 U.S.C. § 1983, and other statutes as separate vehicles for ensuring the rights of handicapped children.").

**8.** The Second Circuit's decision in *Polera v. Bd. of Ed. of Newburgh Enlarged City Schl. Dist.,* 288 F.3d 478 (2d Cir.2002), is factually distinguishable for this reason. The plaintiff in that case was seeking redress under the IDEA for "failure to provide her with the free

Rather, it is defendants who rely upon plaintiff's accommodations in their ill-conceived attempt to justify the actions she asserts constitute discrimination under the ADA and the Rehabilitation Act. Therefore, this Court holds that plaintiff is not seeking redress under the IDEA and is not subject to its exhaustion requirement. *Accord O'Hayre,* 109 F.Supp.2d at 1294 (excusing exhaustion because discrimination claims "not provided for in the IDEA.").

 Even if plaintiff should have exhausted state administrative remedies before instituting this suit, this case falls squarely within the futility exceptions to both New Jersey's and the IDEA's exhaustion requirements. *See Beth V. v. Carroll,* 87 F.3d 80, 88 (3d Cir.1996) (discussing IDEA's futility exception); *Taylor v. Vermont Dept. of Ed.,* 313 F.3d 768, 789 (2d Cir.2002) (same); *River Dell Educ'l Ass'n v. River Dell Bd. of Ed.,* 122 N.J.Super. 350, 353, 300 A.2d 361 (Law Div.1973) (discussing New Jersey's futility exception); *Valent v. New Jersey State Bd. of Ed.,* 114 N.J.Super. 63, 70, 274 A.2d 832 (Ch.Div.1971) (citing *Matawan v. Monmouth County Bd. of Taxation,* 51 N.J.

291, 296, 240 A.2d 8 (1968)) (same). It is undisputed that the Department of Education rebuffed plaintiff's attempt to obtain relief. In its letter responding to plaintiff's application for emergent relief, the Department of Education stated that her request

> does not fall within the [Department's] limited jurisdiction for due process hearings. Therefore, the request for due process cannot be processed because it does not seek a final determination concerning "identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action according to 34 C.F.R. §§ 300.520 through 300.528." *See, N.J.A.C.* 6A:14–2.7(a).
>
> Your discrimination claims pursuant to Section 504 of the Rehabilitation Act ... appear more appropriate for ... a civil action in a court of appropriate jurisdiction. Adjudication of such claims, and awarding of injunctive relief such as that sought in this matter, are not appropriate for a due process hearing.

Complaint at Exhibit F. This letter makes clear that a remand by this Court to the

appropriate public education, including study materials, compensation for tutoring, and recognition of academic achievements, to which she was entitled as a disabled student." *Id.* at 480. The court viewed the plaintiff's request for academic honors as an outgrowth of her free, appropriate public education claim and, thus, subject to the IDEA. *Id.* at 486. The plaintiff here, by contrast, does not allege that she was denied a free, appropriate public education or the right to compete for academic honors, but that, after she qualified for an honor, she was then subjected to discriminatory treatment on account of the accommodations she had been afforded throughout her education. Moreover, this Court questions the Second Circuit's conclusion that a complaint regarding academic honors is redressable under the IDEA because the accordance of such honors goes beyond the "basic floor of opportunity" that Congress intended to pro-

vide disabled students through the IDEA. *See Bd. of Ed. of the Hendrick Hudson Ctrl. Schl. Dist. v. Rowley,* 458 U.S. 176, 192, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("[T]he intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."); *Polk v. Ctrl. Susquehanna Intermed. Unit 16,* 853 F.2d 171, 182 (3d Cir.1988) (stating that IDEA assures only that special needs students receive more than a *de minimis* educational experience). *See also* 20 U.S.C. § 1415(b)(1)(E) (stating that students shall be granted an opportunity to present complaints under the IDEA only "with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free, appropriate public education to such child.").

Department of Education to hear plaintiff's discrimination claims under the Rehabilitation Act would be futile given the Department's interpretation of its jurisdiction under its own implementing statute. *See Taylor,* 313 F.3d at 789 (excusing exhaustion on futility grounds where hearing officer held that due process proceeding was not the proper forum for party's claims); *cf. Kerr Ctr. Parents Ass'n v. Charles,* 897 F.2d 1463, 1470 (9th Cir.1990) (excusing exhaustion on futility grounds where where school district refused to provide hearing); *Valent,* 114 N.J.Super. at 70, 274 A.2d 832 (holding that remand would be futile where agency had informally expressed its opinion on the issue raised by the policy challenged). The Department's statement also strongly suggests that it does not believe that it has jurisdiction over plaintiff's remaining claims because they, like her discrimination claims, do not concern "identification, evaluation, reevaluation, classification, educational placement, the provision of a free, appropriate public education, or disciplinary action." Hence plaintiff had no recourse but to seek judicial relief and, therefore, should not be required to attempt to exhaust a second time even if the Department was incorrect in its understanding of its jurisdiction.[9] *Accord Diamond v. McKenzie,* 602 F.Supp. 632, 635–36 (D.D.C.1985) (excusing failure to exhaust where hearing officer mistakenly believed that she could not redress petitioner's claim). "To hold otherwise, would impose an unnecessary and unjustified burden on the parents and guardians of handicapped children." *Charles,* 897 F.2d at 1469–70.

For these reasons, defendants' motion to dismiss on exhaustion grounds is denied.

## IV. PLAINTIFF IS ENTITLED TO TEMPORARY RESTRAINTS

Having denied defendants' motion to dismiss, I now turn to the merits of plaintiff's application for temporary restraints. Plaintiff petitioned this Court for a preliminary injunction enjoining the Board from discriminating against her based on her disability by adopting and retroactively applying to her the proposed amendment to the Board's current valedictorian policy. While the Court does not have jurisdiction to enjoin the Board from modifying its policies, plaintiff properly contends that this Court has jurisdiction to enjoin the Board from retroactively applying this amendment to her because she is likely to succeed on her discrimination claims.

There are four factors a court must consider in deciding whether to issue an injunction:

1. Whether the movant has shown a reasonable probability of success on the merits;

2. Whether the movant will be irreparably injured by denial of the relief;

3. Whether granting the preliminary relief will result in even greater harm to the non-moving party; and

4. Whether granting the preliminary relief will be in the public interest.

*Tanimura & Antle, Inc. v. Packed Fresh Produce, Inc.,* 222 F.3d 132, 140 (3d Cir. 2000) (citing *Council of Alternative Political Parties v. Hooks,* 121 F.3d 876, 879 (3d Cir.1997) (quoting *Am. Civ. Lib. Union v. Black Horse Pike Reg'l Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc))). As the following analysis reveals, an injunction is warranted in this case.

9. The Court acknowledges defendants' argument that plaintiff may have filed her application with the wrong office within the Department of Education. Even assuming this is true, it does not negate the fact that the Department instructed plaintiff to file a complaint "in a court of appropriate jurisdiction" rather than with another Departmental office.

### A. Likelihood of Success on the Merits

■ Plaintiff's discrimination allegations are two-fold. First, plaintiff asserts that Superintendent Kadri's disparate treatment of her on account of her disability constitutes disability-based discrimination prohibited by both Section 504 and the ADA, for which both Kadri and the Board may be held liable. Second, plaintiff asserts that the retroactive application of the amendment drafted by Kadri and proposed to the Board would constitute discrimination under the same Acts.[10] To protect against this potential harm, she seeks a preliminary injunction. Her request is granted for the following reasons.

■ Section 504 and the ADA "provide a coherent framework and consistent and enforceable standards for the elimination of discrimination against persons with disabilities." *Guckenberger v. Boston Univ.,* 974 F.Supp. 106, 133 (D.Mass.1997) (citing *Thomas v. Davidson Academy,* 846 F.Supp. 611, 620 (M.D.Tenn.1994)). The pertinent text of Section 504 is as follows:

> No otherwise disabled qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

20 U.S.C. § 794(a). In the education context, this language protects special needs students from being treated disparately on account of their disability. *See Weixel,* 287 F.3d at 149 (analyzing ADA and Rehabilitation Act claims alleging discrimination by school administrator who refused to place disabled student in honors-level curriculum); *Hoot v. Milan Area Schl.,* 853 F.Supp. 243, 251 (E.D.Mich.1994) (analyz-

ing ADA and Rehabilitation Act claims alleging discrimination by high school athletic association against special needs student in its decision to prohibit student from participating in sports activities). The ADA prohibits discriminatory conduct in the same fashion and is construed in harmony with Section 504. *See Doe v. County of Centre, PA,* 242 F.3d at 446 (stating courts should "construe the ADA to grant at least as much protection as provided by . . . the Rehabilitation Act."); *Weixel,* 287 F.3d at 146 n. 5. Therefore, the ensuing discussion will apply to both Acts.

■ To establish a prima facie case under Section 504, a plaintiff must show that: (a) she is a handicapped individual; (b) she is otherwise qualified for participation in the program; (c) the program the plaintiff is challenging receives federal financial assistance; and (d) she was subjected to discrimination under the program solely on account of her disability. *Nathanson v. Med. College of Pennsylvania,* 926 F.2d 1368, 1380 (3d Cir.1991). Defendants do not contest the first three of these four requirements, and therefore, the only issue here is whether the retroactive application of the proposed amendment to plaintiff would constitute discrimination on account of her disability.

In *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the U.S. Supreme Court addressed what it means for an individual to be discriminated against under Section 504. The plaintiffs in *Alexander* were disabled medicaid recipients who brought a class action seeking declaratory and injunctive relief under Section 504 for the allegedly discriminatory acts of the State of Tennessee in reduc-

---

**10.** In light of the active role that Superintendent Kadri played in investigating plaintiff's curriculum and in drafting and proposing the policy amendment, the Board may consider itself in a different posture from Kadri in terms of liability. Therefore, I take care in this portion of the opinion to differentiate between these two defendants as appropriate.

ing the number of days for which the state's medicaid program would pay hospitals on their behalf. The Court characterized plaintiffs' theory as one of disparate impact and, while recognizing that such a theory was appropriate under Section 504, went on to hold that plaintiffs had not shown that the discriminatory impact they allegedly suffered was a result of discrimination based on their disability. *Id.* at 303, 105 S.Ct. 712; *see also Helen L. v. DiDario*, 46 F.3d 325, 336 (3d Cir.1995) (discussing *Alexander*). In reaching this conclusion, the Court found it important that the reduction did not have a "particular exclusionary effect on the handicapped." *Alexander*, 469 U.S. at 302, 105 S.Ct. 712. Instead, the reduction was "neutral on its face, [did] not distinguish between those whose coverage will be reduced and those whose will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." *Id.*

The notion that a neutrally applicable rule does not constitute discrimination under Section 504 was further explored in *Timothy H. v. Cedar Rapids Comm. Schl. Dist.*, 178 F.3d 968 (8th Cir.1999). In that case, a special needs student brought suit under Section 504, alleging that she was denied the benefit of her school district's intra-district transfer program on account of her disability. The defendant school district had admitted the plaintiff into the transfer program, but required her to provide her own transportation in order to participate in it. *Id.* at 972. The Eighth Circuit held that the school district's transportation policy was not discriminatory because the policy was neutrally applicable to all students regardless of disability and "unrelated to disabilities and misconceptions about them." *Id.*

At first glance, these precedents might suggest that here the Board's proposed amendment does not constitute discrimination under Section 504 because it appears to be neutrally applicable to all students. The proposed amendment neither directly references persons with disabilities nor accommodations made to them:

> In determining the recipients of [the awards of valedictorian and salutatorian], the Board may review the program of study, manner of instruction, and other relevant issues, and in its discretion, with the assistance of the administration, may designate multiple valedictorians and/or salutatorians to ensure that all students have an equal opportunity to compete for these awards.

Kadri Cert. at ¶ 35. Plaintiff's challenge, however, is not as to the policy on its face, but as to the retroactive application of the policy to her. Indeed, the circumstances underlying the proposal to amend the Board policy as well as the formulation of the amendment, make clear that any application to her would be based on her disability.

Defendants do not contest that the proposed modification to the Board's valedictorian policy is a direct result of complaints Kadri received from students and their parents that these students had not been "provided equal opportunities to earn the [valedictorian and salutatorian] awards, and that accommodations were provided, in a disparate manner, between students." Kadri Cert. at ¶ 7. Furthermore, defendants admit that Kadri interpreted these comments to be directed toward plaintiff. Kadri Cert. ¶¶ 7–8. Kadri avers that, in response to these complaints, he conducted an investigation into plaintiff's educational experience and performance at Moorestown, which included reviewing plaintiff's transcript and comparing it to the transcripts of the three students whose weighted grade point averages most closely approached that of plaintiff's. Kadri concluded that two of the

three students "had not been afforded the accommodations which Plaintiff enjoyed" and that those students "would be negatively affected by those accommodations" in that "they may not be considered for one or either of the graduation awards because of differences in the weighted averages caused, at least in part, by the accommodations provided to Plaintiff." *Id.* at ¶ 34. Kadri then recommended that the Board adopt the challenged amendment with the full expectation that it would be in effect for the selection of valedictorian for the 2002–03 school year. *Id.* at ¶ 35.

Given the historical context of this amendment and Kadri's expectation that it will go into effect before graduation, more than sufficient evidence exists to establish that the Board's proposed action was intended and designed to have a particular exclusionary effect on plaintiff because of her disabled status. *Cf. Timothy H.,* 178 F.3d at 972 (finding no discrimination where there was "no evidence that the [defendant's policy] was formulated or implemented with disabilities in mind."). *Accord In the matter of Prince George's Co. Public Schls.,* 1998 EOHA LEXIS 22, *16 (March 17, 1998) (United States Department of Education ruling employing "as applied" analysis in holding that neutrally-applicable policy was discriminatory). Plaintiff has presented compelling evidence through Kadri's own words and actions which suggests he believed that she received an unfair advantage over other students on account of her disabled status and that, to right the imbalance, her accomplishments should be discounted. *See* Kadri Cert. ¶¶ 7–8, 34–35. Plaintiff aptly summarizes the inference that can be drawn from Kadri's actions: "[r]ather than being lauded for her significant academic accomplishments, the [imposition of] co-valedictorian status under these circumstances will serve only to highlight the fact that due to her disabling conditions, defen-

dants do not consider her achievement to be on par with or comparable to that of a non-disabled student." Brief of Pl. in Support of Order to Show Cause at p. 4.

Defendants' targeted action here is similar to that in *Doe v. County of Centre, PA,* 242 F.3d 437 (3d Cir.2001). In *Doe,* the parents of an HIV-infected child were denied the opportunity to serve in the County of Centre's foster parent program on account of the HIV-infected status of their eleven year-old son, who lived with them. Upon learning of plaintiffs' son's HIV-status, the county's Children and Youth Services employees voiced their concern to the County Board that he might infect any foster children placed in the parents' home. *Id.* at 443. In direct response to the plaintiffs' situation, the Director of Children and Youth Services developed a policy, which the County Board adopted, providing that when someone living in a potential foster home has a "serious infectious disease," only children with the same "serious infectious disease" could be considered for placement in that home. *Id.* at 444. The only means by which foster parent applicants could avoid the implications of this policy was to sign an informed consent form and "voluntarily agree to release information to the parents of the incoming foster child that the foster family has been diagnosed with a specific serious infectious disease." *Id.* Because plaintiffs refused to sign the informed consent form and consent to the disclosure of their son's HIV-status, their application was denied. *Id.* at 445.

The Third Circuit ruled that the Board's application of the infectious disease policy to the plaintiffs in *Doe* was discriminatory under Section 504. In its view, the fact that the policy was specifically directed at the parents of HIV-positive individuals rendered it discriminatory towards those parents. *See id.* at 447. Likewise, here,

any retroactive application of the valedictorian amendment to plaintiff would constitute prohibited disability-based discrimination because it was specifically designed, and will be implemented, for the purpose of requiring plaintiff, who has been granted certain accommodations on account of her disability, to share the valedictorian award solely because of the accommodations she rightfully received from the Board.

This Court's finding of discrimination is further supported by circumstantial evidence offered by plaintiff. With the help of supporting certifications, and, in some cases, simple logic, plaintiff has substantially refuted each of defendants' stated justifications for their actions. The fact that the veracity of each of defendants' justifications has been called into question suggests that the proposed amendment is discriminatory despite its neutral language. *See Davis v. Francis Howell Schl. Dist.*, 138 F.3d 754, 756 (8th Cir.1998) (suggesting that plaintiff may show discrimination by calling into question the truthfulness of a defendant's stated reasons for its actions); *Grube v. Bethlehem Area Schl. Dist.*, 550 F.Supp. 418, 424 (E.D.Pa.1982) (finding discrimination, in part, based on challenge to accuracy of defendant's stated justification). Kadri's numerous calculations of plaintiff's weighted G.P.A. based upon hypothetical curricula he crafted for her further shows the discriminatory intent underlying his actions. His calculations suggest that her weighted G.P.A. would have been only five thousandths of a point less than that of the intervenor. Kadri. Supp. Cert. at ¶¶ 12–13. This difference belies Kadri's contention that the proposed amendment was designed to remedy a "fundamental unfairness." Defendants' Opposition to Order to Show Cause at 9.

Additionally, intervenor's counsel implied at oral argument that the proposed amendment is merely an attempt to redefine the valedictorian opportunity to include only grades from courses taken in-school, or to favor such grades over those earned by students receiving homebound instruction. *See* Transcript at pp. 62–63. As noted by the Supreme Court in *Alexander*, "[a]ntidiscrimination legislation can obviously be emptied of meaning if every discrimination policy is 'collapsed' into one's definition of what is the relevant benefit." *Id.* at 301, 105 S.Ct. 712 (quoting Brief for United States as Amicus Curiae in that case). Therefore, this sort of approach would inappropriately discriminate against students entitled to home instruction as an accommodation under the IDEA. Moreover, such an action would have the effect of diluting the affirmative rights granted special needs students under Section 504 and the IDEA—rights that were deemed necessary by Congress in order to ensure that special needs students could compete with their non-special needs counterparts on an equal basis. *See id.* at 304, 105 S.Ct. 712; 34 C.F.R. § 104.33.

That plaintiff has presented sufficient evidence to support a finding of discrimination is further supported by 34 C.F.R. § 104.4, which defines the types of discrimination prohibited under Section 504. Section (b)(vii) of this provision prohibits actions that "[o]therwise limit a qualified [disabled] person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit, or service." This concept is further delineated by section (b)(4)(ii), which explicitly prohibits entities from "utiliz[ing] criteria or methods of administration ... that have the purpose or effect of defeating or substantially impairing accomplishment of objectives of the recipient's program or activity with respect to handicapped persons." Taken together, these provisions stand for two key propositions: (1) that disabled

persons are entitled to an equal opportunity to participate or benefit from services provided non-disabled persons; and (2) once such a service is provided to a disabled person, that person has a right to the full enjoyment of that service, including its rights, privileges, advantages, and opportunities.

Here, defendants put forth their best efforts to afford plaintiff an equal opportunity to become Moorestown High School's valedictorian. There is no dispute between the parties that plaintiff was afforded the educational services to which she was entitled under the IDEA, and that, with the help of these services, plaintiff earned the valedictorian award. Where defendants have failed plaintiff is with respect to her full enjoyment of this award. Defendants' proposed amendment would have the effect of defeating or substantially impairing this accomplishment.

The Federal Office of Civil Rights ("OCR") letter ruling titled *Letter to Runkel*, 25 IDELR 387 (Sept. 30, 1996), further suggests that the retroactive application of the proposed amendment to plaintiff constitutes discrimination under Section 504. *Letter to Runkel* addressed the question of what criteria should apply to the grading schemes of students with disabilities. This letter, which is entitled to deference as an opinion expressed by the administrative agency in charge of ADA enforcement in school settings, *see Chevron v. Nat'l Res. Def. Council*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), characterizes Section 504 as "requir[ing] that with respect to grades, class ranking, honor rolls, graduation, and diplomas, students with disabilities must be treated the same as all other students." *Runkel*, 25 IDELR 387 at 2. The agency additionally clarified in the letter that a special needs student's grades should not be "discounted ... or otherwise depreciated" based solely on the student's disabled

status. By contrast, the stated effect of defendants' proposed amendment is to subject plaintiff's grades to heightened scrutiny-scrutiny *not* applied to non-disabled students. In addition, as noted by the OCR letter ruling, any differential grading standards should be specified in a special needs student's IEP. *See id.* at 1. Here, again, defendants' proposed action contravenes the agency's pronouncement because plaintiff's IEP states that defendants' standard grading policy shall apply to her courses.

I now address intervenor's citation to *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001) and suggestion at oral argument that it is appropriate for a school board to consider whether a student has been afforded an unfair advantage, on account of accommodations mandated by the IDEA, when fashioning its valedictorian policy. I again note that the Board may change its policy so long as it is prospectively applied. The question here is whether the Board may retroactively apply a policy clearly intended to discriminate against plaintiff. In that connection, *Martin* actually supports the outcome in this case.

Martin, a disabled professional golfer, filed suit under the ADA alleging that the PGA Tour, Inc. ("PGA Tour") discriminated against him by refusing to accommodate his disability by not allowing him to use a golf cart to transport himself from one tee to the next during the latter portion of a tournament. It was undisputed that Martin suffered from Klippel–Trenaunay–Weber Syndrome and, as a result, could not walk the final rounds of an 18–hole course. *Id.* at 668, 121 S.Ct. 1879. PGA Tour argued before the Supreme Court that it was not required to so accommodate his disability because such an accommodation would fundamentally alter the nature of the golf game by granting

him an unfair competitive advantage over his non-disabled competitors who would likely suffer more fatigue from having to walk the last few rounds.[11] *Id.* at 669–70, 121 S.Ct. 1879.

In ruling for Martin, the Supreme Court made several noteworthy observations which I find instructive here. First, the Court commented that "golf is a game in which it is impossible to guarantee that all competitors will play under exactly the same conditions or that an individual's ability will be the sole determinant of the outcome. For example, changes in the weather may produce harder greens and more head winds for the tournament leader than for his closest pursuers. A lucky bounce may save a shot or two .... [P]ure chance may have a greater impact on the outcome of an elite golf tournament than the fatigue resulting from the enforcement of the walking rule." *Id.* at 687, 121 S.Ct. 1879. Second, the Court noted that expert testimony presented by Martin, which established that the fatigue from walking during one of PGA Tour's 4–day tournaments was not significant, effectively undermined PGA Tour's position. *Id.* These facts, among others, led the Court to conclude that allowing plaintiff to use a golf cart would not grant him an unfair competitive advantage and, therefore, that PGA Tour's refusal to accommodate him was discriminatory. *Id.* at 690, 121 S.Ct. 1879.

As in a professional game of golf, it is impossible to guarantee that a student's educational abilities will be the sole determinant of academic success in a highly regarded and competitive high school. Teachers employ different grading standards, even those who teach the same course.[12] Indeed, grading itself is often subjective and, thus, the same teacher may grade differently two students in the same class who are performing substantially at the same level. This is particularly true when the students are gifted and the distinction between performances is slight. Students have different technological support available to them in their homes, or may enjoy the benefit of an older sibling or parent to assist them. The permutations are endless; the playing field for students rarely is the same. Furthermore, as described above, the specific allegations of unfair competitive advantage alleged by defendants have been substantially refuted by plaintiff. Just as the disabled golfer in *Martin* did not receive an unfair competitive advantage from his accommodation, neither did plaintiff receive an unfair competitive advantage from her accommodation. This Court is convinced that plaintiff has presented sufficient evidence that she is likely to succeed on her discrimination claims under the ADA and Section 504 because she did not receive an unfair competitive advantage on account of her accommodations under the IDEA.

11. Although PGA Tour initially denied Martin's request for an accommodation, the district court entered a preliminary injunction which required PGA Tour to allow Martin to use a cart. That court later ruled for Martin at the conclusion of a bench trial and PGA Tour appealed this ruling to the Supreme Court.

12. The Court is cognizant of defendants' argument that plaintiff was able to earn an A+ in AP U.S. History as taught by the home instructor whereas her peers who completed the course in school were unable to earn the same grade because the in-class teacher has never granted an A+ to a student. In contrast, plaintiff's AP Calculus home instructor appears to have graded plaintiff more stringently than her in-class teacher. *See* Nothdurft Cert. at ¶¶ 5–10. These examples buttress this Court's finding that individual teachers often employ different grading standards.

Additionally, rulings by the New Jersey Commissioner of Education further reveal the weakness of defendants' position. The case of *Shankar v. Board of Education of the City of New Brunswick, Middlesex County,* OAL Dkt. No. EDU 3848–89 (1989) (unpublished), cited by defendants, in fact supports plaintiff's argument that the Board should not be permitted to name multiple valedictorians. *See also F.J.T. v. Bd. of Ed. of the City of Burlington,* OAL Dkt. No. EDU 4545–91 (1991) (as modified on appeal to Commissioner of Education) (holding that school board must follow established board policy). In *Shankar,* the senior in New Brunswick high school with the highest G.P.A. in his class, Amitabh Shankar, believed he would be named valedictorian pursuant to the current school policy. However, during his senior year, the New Brunswick Board of Education Superintendent sought to have the Board amend its policy to establish a three year school residency requirement for all those eligible for the award. *Id.* at 1994. Since Shankar had only attended the school for two years, he was informed that he would not be valedictorian. *Id.* at 1982. He brought an action before the New Jersey Office of Administrative Law[13] seeking an order directing the Board to name him valedictorian. *Id.* at 1978. The Commissioner of Education found that the Board had not formally adopted the residency policy, and in any event,

the Board may not retroactively apply conditions upon a pupil that will affect him without proper notice. Such notice could only have been provided following formal adoption of the requirements by the Board to all students in the high school at the time they entered [the school], through a uniform notification device, such as the student handbook. To conclude otherwise would be to endorse after-the-fact application of a procedure and could result in situations like the instant matter.

*Id.* at 1994. The Commissioner stressed that any residency requirement for the award of valedictorian "may only be carried out after all students have been apprised of such policy in a uniform and *prospective* manner." *Id.* at 1995 (emphasis added). Thus, any new policy could not apply retroactively to Shankar and, accordingly, the Commissioner directed the Board to name Shankar valedictorian. The Commissioner also directed the Board to name as co-valedictorian the student with the highest G.P.A. who had attended the school for at least three years, in part because the Board had in effect prematurely designated her valedictorian, and thus, at that point, it would have been unfair to strip her of that award. *Id.* at 1990–91; 1994–95.[14]

As in *Shankar,* the Board in this case intends to apply a new valedictorian policy retroactively to Ms. Hornstine. She has worked tremendously hard throughout her four years at Moorestown High in order to distinguish herself as the valedictorian, in spite of her disability. The student handbook memorialized the policy that was in effect for her entire tenure at the school: that the student with the highest seventh semester weighted G.P.A. would be named the sole valedictorian. Defendants now seek to diminish her award by naming

---

**13.** In *Shankar,* the OAL was the proper forum to resolve the student's complaint, which implicated only Board policy and did not state any ADA or Rehabilitation Act claims. *See Balsley,* 117 N.J. at 441–42, 568 A.2d 895.

**14.** In this case, the Moorestown Board of Education has not publically designated K.M. as valedictorian; it has simply informed him that he is being "considered" for the award. Thus, this Court has the opportunity to act on this TRO to prevent the Board from taking such action.

another, non-disabled valedictorian, pursuant to a policy that is to take effect *after* plaintiff has already completed seven semesters. I agree with the Commissioner's decision in *Shankar*—any new valedictorian policy can not be applied retroactively to plaintiff. *Id.* at 1995.

### B. Irreparable Harm

 In order to gain injunctive relief, plaintiff must show that she will be irreparably harmed without it. *Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974). Irreparable harm is shown when money damages can not adequately compensate plaintiff's injuries. *See id.*

In *T.M. v. Mercer County Junior & Senior High Schl.,* OAL Dkt. No. EDS 4317–02S, 2002 WL 1589870 (2002) *available at http://www.lawlibrary.rutgers .edu/oaldecisions/initial/eds04317–02 1.html* (visited May 5, 2003), a special needs student challenged his local school board's decision to prohibit him from attending his high school graduation ceremony and from marching in the processional for disciplinary reasons. Administrative Law Judge Israel D. Dubin reasoned that:

> [m]ore so than their regular education counterparts, special needs students derive a great deal of satisfaction and substantially increase their self-esteem by participating in such ceremonies. It sends a very positive message that even with all of the frustrations and missteps they have encountered along the way, they were able to accomplish a very difficult task. Moreover, a graduation ceremony is an event that, once missed, cannot be replaced.

*Id.* at \*3. Judge Dubin concluded that missing a high school graduation ceremony is an *irreparable injury*, since the student can not be made whole with financial compensation. *Id.*

 In this case, it is undisputed that plaintiff persevered through the hardship of her disability to not only graduate, but to graduate first in her class. Instead of taking pride in her fine example, defendants seek to strip plaintiff of the distinction of sole valedictorian. Superintendent Kadri has made no secret of the fact that he believes plaintiff should not be the only valedictorian because she was granted accommodations on account of her disability. This was the message he sent to the senior class in February 2003, when he addressed his concerns to them about the inequality of the current valedictorian policy. If the Board were to name another valedictorian along with plaintiff, it would be sending the message loud and clear: "we have two valedictorians this year—a disabled one, and a non-disabled one." This would diminish the award which plaintiff has worked so hard to attain. Instead of honoring her as the student who earned the highest grades in her class in spite of her disability, the Board would be demeaning her by insinuating that her grades are not as meaningful because she rightfully received accommodations on account of her disability.

If plaintiff were forced to accept her award along with a non-disabled student, the stigma would likely be unshakable. She would doubt her own accomplishments, and question the significance of being the "disabled valedictorian." Just as Judge Dubin in *T.M.* reasoned that "a graduation ceremony is an event that, once missed, cannot be replaced," *id.,* so too is the conferring of a valedictorian award at plaintiff's graduation a once-in-a-lifetime event. Defendants have only one chance to grant plaintiff the distinction she deserves, without diminishing it by treating her differently than her non-disabled classmates. If plaintiff is not the sole valedictorian, she will suffer irreparable harm that cannot be compensated by money damages. *Accord Dennin v. Connecticut Interscholastic Athletic Conference, Inc.,*

913 F.Supp. 663, 667 (D.Conn.1996) (school policy allowing a disabled student to participate in school swim meets without being able to earn points for the team constituted differential treatment which would diminish the student's sense of parity with his teammates and result in irreparable harm), *appeal dismissed as moot by* 94 F.3d 96 (2d Cir.1996).

## C. Granting the Temporary Restraint Will Not Result in Greater Harm to the Non-moving Party

 In light of the above analysis, there can be no contention that granting plaintiff's application for temporary restraints will result in greater harm to the non-moving parties in this action. Defendants have not identified any harm to themselves other than that which may be visited upon the students who cannot share in the honor of valedictorian. Thus, it is K.M.'s purported harm which must be addressed. As to the nature of his harm, K.M. states "it is my position that, even accepting that Ms. Hornstine was disabled in some way,[15] and therefore, entitled to the benefits she received, there is no legal basis upon which I should be excluded from enjoying the benefits that I have achieved without any special privileges or benefits being conferred upon me." Certification of K.M. in Support of Notice of Motion to Intervene at ¶ 17. K.M.'s argument simply does not carry the day. K.M.'s premise that plaintiff has received "special privileges or benefits" reflects a misunderstanding of the IDEA, and the accommodations plaintiff was entitled to receive pursuant to the Board-approved IEP. Furthermore, as pointed out by plaintiff's counsel at oral argument, plain-

tiff's in-school classmates receive benefits she cannot enjoy: plaintiff cannot participate in class discussions and share in the ideas of her classmates and teachers, she does not get the benefit of cooperative learning, and receives only half the teaching hours that regularly-schooled students enjoy. *See* L. Hornstine Cert. at ¶ 11 n.1. Finally, if I were to deny plaintiff's application, I would be permitting the non-moving parties to engage in discriminatory conduct. Accordingly, I find that the imposition of the injunction will not result in a greater harm to the non-moving parties.

## D. Granting the Preliminary Relief Will Be in the Public Interest.

The IDEA mandates that all students receive a free and appropriate public education. In this connection, defendants afforded plaintiff this right through her IEP. Plaintiff's IEP was constructed, ratified, and implemented by defendants. Defendants belatedly seek to characterize plaintiff's remarkable academic success as less than it is *because* of her IEP. Permitting defendants to diminish plaintiff's accomplishments by awarding multiple valedictorian and salutatorian awards will not be in the public interest.

Without the imposition of temporary restraints, defendants would be discriminating against plaintiff because of her disability. Such conduct should not and cannot be tolerated by society. "New Jersey 'prides itself on judging each individual by his or her merits' and on being 'in the vanguard in the fight to eradicate the cancer of unlawful discrimination of all types from our society.'" *Boy Scouts of Amer-*

---

**15.** This parenthetical comment is particularly troubling because it underscores the distasteful tenor of this dispute. While there is no question that plaintiff is disabled and entitled to accommodations under the IDEA, *see generally Weixel*, 287 F.3d at 146–50 (holding that students suffering from chronic fatigue syndrome and other physical disabilities are entitled to protection under the IDEA, Rehabilitation Act, and ADA to the same extent as learning-disabled students), nonetheless, public comment, which obviously infected Superintendent Kadri, unfairly implies the contrary.

*ica v. Dale,* 530 U.S. 640, 664, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000) (quoting *Peper v. Princeton Univ. Bd. of Trustees,* 77 N.J. 55, 80, 389 A.2d 465 (1978)). Indeed, the imposition of temporary restraints furthers the goal of eradicating discrimination and is, therefore, certainly in the public interest.

### V. CONCLUSION

In summary, it appears that Superintendent Kadri and the Board initially attempted to appease the interests of some parents and students in the school community by reviewing plaintiff's academic history to confirm that she had fairly earned the valedictorian award. In so doing, however, defendants adopted the assumption that somehow plaintiff's disability and accommodations have given her an academic advantage over other students. They have lost sight of the fact that plaintiff, unlike her peers, suffers from a debilitating medical condition, which has never been disputed by the Board, and that her accommodations were aimed at putting her on a level playing field with her healthy classmates. Defendants should revel in the success of their IDEA program and the academic star it has produced; instead they seek to diminish the honor that she has rightly earned.

Regrettably, this issue has polarized the graduating class and the community—most of whom are uninformed about the facts and the law.[16] In light of that, I want to make clear that the evidence in this case has shown that Ms. Hornstine earned her distinction as the top student in her class in spite of, not because of, her disability.

Accordingly, plaintiff is entitled to an order directing defendants to follow the policy that is in effect: the student with the highest seventh semester weighted grade point average will be named *the* valedictorian. It is undisputed that plaintiff meets that criterion; thus, she should be the sole valedictorian of the Moorestown High School Class of 2003.

---

**16.** I am also constrained to point out that the fierceness of the competition in Moorestown High School is evidenced by the widespread involvement of parents in this dispute, which may have been fueled by the school's emphasis on grade-based distinctions. While the School's Handbook states that it seeks to minimize competition by no longer reporting class rank, Handbook at 58, elsewhere it heightens the level of competition by naming a valedictorian and salutatorian, and by further denoting honors based on weighted GPA:

Additional recognition at graduation will include the following:

• Students with a WGPA of 4.250 and higher will wear a gold tassel and be noted in the graduation program with a plus (+) for Highest Honors.

• Students with a GPA of 3.700 to 4.249 will be noted in the graduation program with an asterisk (*) for High Honors.

• Students with a perfect 4.0 average for all four years (all A grades) will be noted in the graduation program with an "o".

*Id.* at 35. It is unfortunate that the burdens of competition imposed on these students by parents and the school community have further fanned the flames of this controversy.