Matthew L. TICE, a minor, By and Through his parents; Connie L. TICE; Kevin S. Tice, Plaintiffs–Appellants,

v.

BOTETOURT COUNTY SCHOOL BOARD; Clarence S. McClure, Superintendent of Education, Botetourt County Public Schools; Phyllis T. Simmons, Supervisor, Special Education Services, Botetourt County Public Schools; John W. Horner, former Principal of Colonial Elementary School, Botetourt County Public Schools, Defendants–Appellees.

Virginia School Boards Association; Virginia Department for Rights of the Disabled, Amici Curiae.

No. 89–2783.

United States Court of Appeals, Fourth Circuit.

Argued May 10, 1990.

Decided July 18, 1990.

William David Paxton (argued), Gentry, Locke, Rakes & Moore, Roanoke, Va. (Leisa Kube Ciaffone, on brief), for plaintiffs-appellants.

Charles Robinson Allen, Jr. (argued), Roanoke, Va., for defendants-appellees.

Kathleen Shepherd Mehfoud (argued), Hazel, Thomas, Fiske, Weiner, Beckhorn & Hanes, P.C., Richmond, Va., for amicus curiae Virginia School Boards Ass'n.

Lois V. Ragsdale, Philip C. Barr, Dept. for Rights of the Disabled, Richmond, Va., on brief, for amicus curiae Dept. for Rights of the Disabled.

Before ERVIN, Chief Judge, HALL, Circuit Judge, and DUPREE, Senior United States District Judge for the Eastern District of North Carolina, sitting by designation.

K.K. HALL, Circuit Judge:

Matthew L. Tice, by and through his parents Connie L. Tice and Kevin S. Tice, appeals from the order of the district court entering judgment in favor of the Botetourt County School Board and three individuals. The Tices' claims were for reimbursement of educational expenses under the Education of All Handicapped Children Act of 1975 ("Act"), 20 U.S.C. §§ 1401 *et seq.*, for violation of due process under 42 U.S.C. § 1983, and for the state tort of intentional infliction of emotional distress. Finding that the Tices may be entitled to partial reimbursement under the Act, we vacate the judgment on that claim and remand for further proceedings.

## I

### A. *Statutory Background*

The Act provides federal funds to assist state and local education authorities in the education of handicapped children. This funding is conditioned on a state's compliance with extensive procedural requirements and on the existence of a state policy that "assures all handicapped children the right to a free appropriate public education ("FAPE")." 20 U.S.C. § 1412(1); *see generally Board of Educ. of Hendrick Hudson Cent. School Dist. v. Rowley,* 458 U.S. 176, 179–81, 102 S.Ct. 3034, 3037–38, 73 L.Ed.2d 690 (1982). A FAPE provides a handicapped child with an education "which emphasizes special education and related services designed to meet [that child's] unique needs." 20 U.S.C. § 1400(c). "Special education means specially designed instruction, at no cost to parents or guardians, to meet the unique needs of a handicapped child, including ... instruction in hospitals and institutions." 20 U.S.C. § 1401(a)(16). The "related services" that the public schools must provide include "such developmental, corrective, and other supportive services (including ... psychological services ... and medical and counseling services, except that such medical services shall be for diagnostic and evaluation purposes only) as may be required to assist a handicapped child to benefit from special education." 20 U.S.C. § 1401(a)(17). A FAPE is provided to a child through an individualized educational program ("IEP"), a specially designed program of instruction. An IEP, which is developed through consultations with the child's parents or guardian (and, where appropriate, the child), must include, *inter alia,* a statement of the child's annual educational goals, the specific educational services to be provided, and the projected date for initiation and duration of such services. 20 U.S.C. § 1401(a)(19).

### B. *Facts*

Matthew is an eleven year old boy who is of above-average intelligence, but who, as all parties readily acknowledge, suffers from both learning and emotional disabilities. Matthew's problems came to light when he encountered difficulty performing at school, which in turn led to even more problems at home. As Matthew's situation deteriorated, the Tices conferred with his first grade teacher. They determined that the best course for Matthew was to seek special education services. On March 19, 1986, school officials received the Tices' formal request that Matthew be evaluated for special education. This referral initiated the evaluation process which is the focus of this litigation.

A Child Study Committee was appointed from the personnel at Matthew's school to consider the Tices' referral.[1] On April 18, 1986, some 22 administrative working days after the referral, the committee met and unanimously recommended that Matthew be assessed for special education services. By state regulation, however, this meeting was required to occur within ten working days of the referral. State Regulations § II(A)(4)(d) (1984). This relatively minor procedural error was compounded by a more egregious delay in the formal assessment of Matthew's needs. The evaluation process should have been completed within 65 working days of the initial referral. *Id.* § II(A)(6)(e). It is uncontested that Botetourt County, however, did not convene a meeting of an Eligibility Committee to decide Matthew's placement until October 13, 1986, over 200 days after the March 19 referral and well into Matthew's second grade year.

At the October 13 meeting, the Eligibility Committee determined that Matthew was not handicapped and, therefore, was ineligible for special education services. The Committee did recommend that he receive

---

1. This committee reviews a referred child's records and performance evaluations to determine if the child should be formally assessed for a handicap. Regulations Governing Special Education Programs for Handicapped Children and Youth in Virginia ("State Regulations")

§§ II(A)(4)(c), (5)(a). After the necessary testing is done, the determination of a child's handicapped status is left to a separate Eligibility Committee which is composed, at least in part, of persons who assessed the child. *Id.* § II(B).

counseling at his parents' expense. The Tices requested that the Committee's decision be deferred until Matthew could be evaluated by outside professionals. On October 30, the Eligibility Committee agreed to this request, also agreeing to pay for the evaluations.

The Tices were referred to a Dr. Gray, a licensed child psychiatrist, who examined Matthew on November 16, 1986. Dr. Gray found Matthew to be suffering from deteriorating mental and emotional problems, which were both a cause and an effect of his troubles at school. He recommended immediate placement in special education services. A copy of Dr. Gray's report was received by the School Board on December 1, 1986.

On December 4, 1986, Matthew became hysterical at school and was taken home by his mother. Once home, his condition worsened. Later that day, on the advice of Dr. Gray, Matthew was admitted to the Roanoke Valley Psychiatric Center. He was suffering from what Dr. Gray characterized as a nervous breakdown.

While hospitalized, Matthew was treated for depression, paranoia, and anxiety. Roanoke Valley attempts to comprehensively meet its patients' educational, emotional, and physical needs. Accordingly, Matthew received daily (five days a week, 5 hours a day) educational services at the Blue Ridge Center, the certified school program operated by the hospital. He also participated in play and group therapy programs, received individual counseling, and participated in recreational activities in behavioral modification. Matthew was released from Roanoke Valley on December 24, 1986.

Meanwhile, on December 17, 1986, the Eligibility Committee reconvened and rescinded its previous decision concerning Matthew. The Committee found him eligible for special services as a handicapped child in both the emotionally disturbed and learning disabled categories. The Committee decided, however, to await Matthew's release from Roanoke Valley to address his needs.

On January 6, 1987, Connie Tice met with Botetourt County officials to discuss Matthew's IEP for the rest of the 1986–87 school year. An IEP was designed in consultation with her to address Matthew's emotional and learning problems. It did not provide for individualized psychological counseling, and none was requested by the Tices. Mrs. Tice agreed to and signed the IEP. Matthew and his parents continued to receive counseling from Dr. Gray through June 1987 at the Tices' expense. Matthew's condition improved greatly and he successfully completed first grade.

In July 1987, the Tices made a demand on the School Board for full reimbursement of the expenses incurred during Matthew's hospitalization as well as for the counseling done after Matthew received his IEP. They claimed that because of the undue delay in Matthew's evaluation, he was denied the FAPE to which he is entitled under the Act. They argued that this denial necessitated Matthew's hospitalization and subsequent need for psychiatric help and that these were necessary related services for his education. The School Board rejected their claim. The Tices then requested and were granted a formal due process hearing. *See* State Regulations § II(C)(1)(b)(1).

On February 18, 1988, the hearing officer issued an opinion finding in favor of Botetourt County. While finding that the School Board had violated the evaluation time limits established by state regulation, he held that because the Tices failed to prove that these delays "caused or significantly contributed to" Matthew's hospitalization, they could not recover this expense under the Act. He also held that the counseling services rendered to Matthew while hospitalized and thereafter were purely medical and thus not compensable under the Act. As to the expense of his schooling at the Blue Ridge Center, the hearing officer also found it not covered by the Act because it was necessitated primarily because of Matthew's medical and emotional needs. The Tices appealed this decision.

By consent of the parties, the Tices' appeal was consolidated with a separate origi-

nal due process hearing over whether Dr. Gray's counseling services should be included in Matthew's 1987–88 IEP. A hearing on both matters was held before a state review officer on April 12, 1988. On similar reasoning, the review officer affirmed the hearing officer's decision not to order reimbursement. The issue of Matthew's 1987–88 IEP was settled by the parties.[2]

On June 20, 1988, pursuant to 20 U.S.C. § 1415(e), the Tices filed suit in district court challenging the review officer's decision. The Tices also alleged a due process violation under 42 U.S.C. § 1983 and the state law tort of intentional infliction of emotional distress. They also requested an award of attorney's fees under the Act's fee provision, 20 U.S.C. § 1415(e)(4), as a prevailing party on their claim for reimbursement of Dr. Gray's fees for the 1987–88 school year. Named as defendants were the School Board, Clarence McClure (Superintendent of Botetourt County Schools), John Horner (Matthew's principal), and Phyllis Simmons (Special Education Supervisor for Botetourt County).

After a bench trial, the district court upheld the ruling of the state review officer in all respects. In an opinion issued on June 5, 1989, the court agreed that the record did not support a finding that the School Board's violations of the evaluation time limits created Matthew's need for psychiatric care. The court held that even if these violations denied Matthew a FAPE from March through December 1986, Matthew's hospitalization was nonetheless a medical service not covered by the Act. As for the schooling that Matthew received at the Blue Ridge Center, the district court found it unreimbursable because the School Board had decided to address Matthew's needs after he was released from Roanoke Valley, and this reasonable decision on educational policy deserved deference. Likewise, the court denied reimbursement for the post-hospitalization psychotherapy on a finding that it was not necessary to Matthew's IEP. The court also declined to award the Tices attorney's fees under the Act, finding that they were not a prevailing party on their claim for the 1987–88 school year. On the Tices' claims for damages under § 1983, the court entered judgment in favor of defendants on a finding that their actions were cloaked with official immunity. The tort claim was also rejected because of the lack of evidence that anyone affiliated with the Botetourt County School System acted intentionally to inflict emotional distress on Matthew or his parents. After denial of the Tices' motion to amend the judgment, this appeal followed.[3]

## II

■ Appellants argue that the trial court erred by conditioning in any way reimbursement under the Act on a finding of a causal connection between the School Board's uncontested violations of the evaluation time limits and the need for Matthew's hospitalization and subsequent psychotherapy. They argue in the alternative that the lower court erroneously assigned to them the burden of proof on this point and that, regardless, they proved the causal connection. Appellants also challenge the lower court's holding that the services Matthew received while hospitalized and afterward were not "related services" covered by the Act. We begin with the question of causation.[4]

---

2. In the settlement, the School Board agreed to periodically consult Dr. Gray about Matthew's progress and his IEP. The Tices agreed to drop any claims for reimbursement for Dr. Gray's services rendered in the 1987–88 school year. The Tices also agreed that psychiatric consultations were not necessary for Matthew's IEP and not reimbursable under the Act.

3. The Tices have chosen not to appeal the judgment entered on their state tort claim.

4. Appellants also contest the district court's denial of attorney fees on a finding that they were not a prevailing party in the 1987–88 IEP claim. We find this argument meritless. To be a prevailing party, appellants must have succeeded on "any significant issue in litigation which achieved some of the benefit the parties sought in bringing suit." *Texas State Teachers Ass'n v. Garland Indep. School Dist.,* 489 U.S. 782, 109 S.Ct. 1486, 1493, 103 L.Ed.2d 866 (1989) (interpreting 42 U.S.C. § 1988). This they did not do. They failed to recover any of Dr. Gray's fees and they conceded in the settlement that his services were not necessary for Matthew's IEP. Although they did succeed in getting the School

From the first state administrative proceedings to argument before this court, much has been made of the necessity of a causal connection between the School Board's procedural violations and Matthew's hospitalization in order for the Tices to be reimbursed under the Act. The parties also sharply dispute who carries the burden of proof on this issue. This focus on causation misses the point.

■■ As the Supreme Court made clear in *School Comm. of Town of Burlington v. Massachusetts Dep't of Educ.*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985), reimbursement of special education expenses under the Act is appropriate on findings that the public schools' placement was not providing the child with a FAPE and that the parents' alternative placement was "proper" under the Act. Thus, the salient inquiry is whether or not Matthew was receiving a FAPE at the time of his hospitalization and subsequent psychotherapy. If he was, then the Act's requirements have been fulfilled and the School Board has no obligation to reimburse appellants. If not, the issue becomes whether Matthew's placement at the hospital and the hospital's educational facility, the Blue Ridge Center, and his subsequent use of Dr. Gray's services, were proper under the Act. If the Tices can prove these placements were proper,[5] then they are entitled to reimbursement of all special education and related services expenses. Whether the lack of a FAPE *caused* this hospitalization is simply inapposite to the Tices' right to recover these expenses.[6] We turn now to the question of the school board's provision of a FAPE.

### III

In determining whether Matthew was in fact receiving a FAPE from December 1986 until the end of the 1986–87 school year, we are guided by the twofold inquiry set out in *Rowley:*

> First, has the State complied with the procedures set forth in the Act? And second, is the [IEP] developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits?

458 U.S. at 206–07, 102 S.Ct. at 3050–51. For purposes of our analysis, it is expedient to make this inquiry separately for appellants' claim for hospitalization expenses incurred before implementation of Matthew's IEP and their claim for post-IEP psychotherapy.

### A. Hospitalization Claim

■ As to the first part of the *Rowley* inquiry, the answer is no. Botetourt County concedes that it failed to complete Matthew's evaluation on time and that, at the time of his hospitalization, he was handicapped as defined by the Act. As we have repeatedly held, "failures to meet the Act's procedural requirements are adequate grounds by themselves for holding that a school failed to provide … a FAPE." *Hall v. Vance County Bd. of Educ.*, 774 F.2d 629, 635 (4th Cir.1985), *quoted in Board of Educ. of Cabell County v. Dienelt*, 843 F.2d 813, 815 (4th Cir.1988); *see also Hudson v. Wilson*, 828 F.2d 1059, 1063 (4th Cir.1987) ("procedural noncompliance can by itself support a finding that a child has not been provided with a FAPE"). *Hall* and *Dienelt* both involved situations

---

Board to agree to periodically consult Dr. Gray, they made no showing that school officials were not already consulting a psychological professional in monitoring Matthew's progress. The record fully supports the district court's denial of attorney's fees.

5. Appellants have made much over the question of who had the burden of proof before the district court. As we made clear in *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 258 n. 2 (4th Cir.1988), the deference due the decision of the underlying state administrative process requires that the party challenging the

administrative decision bear the burden of proof. This rule is nothing more than a recognition that the conclusions of a decision-maker, which has had the benefit of more immediate and direct exposure to a controversy, demand respect on review. The district court did not err by imposing the burden of proof on appellants.

6. This question of causation may have been relevant to the § 1983 claim. The Tices appealed the judgment entered on this claim but chose not to brief the point. Regardless, the district court's finding of immunity was entirely appropriate and is affirmed.

where the local education authority failed to comply with the Act's guidelines for consulting parents in the development of their child's IEP, a procedural default which rendered the resulting IEP fatally flawed. This reasoning applies with full force in this situation, inasmuch as the School Board's procedural lapses and the resulting six-month delay directly resulted in there being *no* IEP in place at the time of Matthew's hospitalization and placement at Blue Ridge. It is beyond cavil that, at that time, Matthew was not receiving a FAPE.[7]

### B. *Psychotherapy Claim*

The answer to the first *Rowley* inquiry is not so clear, however, when we look at the claim for psychiatric services rendered after Matthew's IEP was put in place on January 6, 1987. There is no allegation that this IEP was formulated without full compliance with all of the Act's procedural requirements for parental input.[8] Further, appellants do not argue that Botetourt County's violations of the evaluation time limits had any detrimental effect on the substance of this IEP, only that the IEP's development and implementation were unduly delayed. Thus, unlike the situations in *Hall* and *Dienelt,* and unlike appellants' claim for expenses incurred during the hospitalization when no IEP was in place, these procedural violations had no impact on whether Matthew's IEP adequately assured him of a FAPE after January 6, 1987. Accordingly, in order for appellants to prevail on the claim for expenses incurred after this date, they must prevail on the second, more difficult prong of the *Rowley* inquiry. They must prove that Matthew's IEP, absent psychiat-

ric counseling, was not reasonably calculated to enable him to receive educational benefits. This they cannot do.

As the Court made clear in *Rowley,* once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment of education professionals. 458 U.S. at 207–08, 102 S.Ct. at 3051–52. Neither the district court nor this court should disturb an IEP simply because we disagree with its content. Rather, we must defer to educators' decisions as long as an IEP provided the child "the basic floor of opportunity that access to special education and related services provides." *Id.* at 201, 102 S.Ct. at 3048. The district court did not clearly err in holding that this IEP meets this threshold test. The IEP to which the Tices agreed provided that Matthew receive 2½ hours per day of learning disability instruction, 2½ hours per day of emotional disability instruction, and regular instruction in gym and music. This IEP obviously addresses both of Matthew's special needs, and, in view of the great improvement in his post-IEP performance and his successful completion of the requirements for advancing to second grade, *see id.* at 203, 102 S.Ct. at 3049, we cannot reverse the lower court's finding that the IEP was reasonably calculated to confer educational benefits. We therefore affirm the district court's holding that after January 6, 1987, Matthew was receiving a FAPE. Consequently, the School Board satisfied its obligations under the Act and has no duty to reimburse appellants for the cost of this counseling.

### IV

Because Matthew was not receiving a FAPE at the time he was hospitalized,

---

**7.** Because we find the violations of the evaluation time limits sufficient to show that Matthew was not receiving a FAPE at the time of his hospitalization, we need not reach appellants' claims of other procedural errors regarding the makeup of the eligibility committee.

Appellants posit that once these serious procedural errors were shown, the burden of proof should shift to the School Board to demonstrate that, regardless of these errors, Matthew was still receiving a FAPE. We need not pass on this argument because here, where the School Board had taken no steps to implement an IEP

at the time of hospitalization, it makes no difference who had the burden of proof. There is simply no question that Matthew was not receiving a FAPE.

**8.** Appellants did argue below and before this Court that the School Board did not give them adequate notice of their rights under the Act. The district court rejected this argument, finding that the School Board substantially complied with its notice obligations. We find this conclusion supported by the record and affirm.

reimbursement of those expenses hinges on whether the Tices' placement of Matthew in Roanoke Valley (and the Blue Ridge Center) was proper to meet the Act's educational goals. *Burlington School Comm.*, 471 U.S. at 369–70, 105 S.Ct. at 2002–03. The district court found the placement improper, reasoning that such hospital placements would burden the School Board "beyond the contemplation of the Act." This view is legally incorrect. As we have noted, the Act's definition of "special education" expressly includes "instruction in hospitals and institutions." 20 U.S.C. § 1401(a)(16). Thus, the fact that Matthew was hospitalized while he received instruction at Blue Ridge in and of itself does not make this placement improper.

■ The lower court also found the placement unnecessary and improper because of the Eligibility Committee's December 17 decision to wait until Matthew's release from Roanoke Valley to meet his special educational needs. The court held that, under the circumstances, this was a reasonable educational decision that should not be judicially second-guessed. As discussed above, we wholeheartedly agree that once education authorities have made a professional judgment about the substantive content of a child's IEP, that judgment must be respected. *Rowley*, 458 U.S. at 207–08, 102 S.Ct. at 3051–52. This common sense principle of judicial review, however, has no application here. At the time Mat-

thew was first hospitalized and placed at the Blue Ridge Center, because of the School Board's default in evaluating his special needs, *no* professional decision had been made to which deference was due.[9] Likewise, the Eligibility Committee's post-hospitalization decision to do nothing until Matthew was released is little more than an after-the-fact decision to justify its previous dereliction of duty. This post hoc rationalization cannot immunize Botetourt County from responsibility for what otherwise might very well be a proper placement under the Act.[10]

■ In sum, because the district court's reasons for finding this placement improper were based on incorrect premises, we vacate that finding. Because the record before us is inadequate to make the inherently factual determination of whether this placement was proper, we remand this issue to the district court for its further consideration.[11]

·V

■ Under the Act, the reimbursement remedy is limited to only expenses incurred for "special education and related services." 20 U.S.C. §§ 1400(c); 1401(a)(18). As we previously noted, "related services" excludes all "medical services," unless rendered solely for diagnostic or evaluative purposes. 20 U.S.C. § 1401(a)(17). As an alternative grounds for rejecting the Tices'

9. Arguably, in other circumstances, the October 17, 1986, decision by the Eligibility Committee that Matthew was not handicapped, and thus was not eligible for the Act's protections, is the type of decision that is due judicial deference. Here, however, the School Board concedes that this decision was in error and, regardless, on October 30 it was deferred pending Matthew's further evaluation. Consequently, at the time of his hospitalization, the School Board had made no decision concerning his placement.

10. We certainly do not hold that the Act imposes a duty on the public schools to always provide special education services to handicapped children who are subject to short-term medical hospitalizations. In many cases, it would be a reasonable educational decision to suspend educational services until a child is released from such a hospitalization. Here, however, the School Board had never provided a FAPE in the

first place. It would thus be inconsistent with the spirit and purpose of the Act to allow the School Board to continue this deprivation merely because Matthew was hospitalized.

11. On remand, the School Board's complete default in evaluating Matthew's needs should be considered in determining whether this placement was proper. As the Fifth Circuit recognized, "parents who elect to risk shouldering the cost of what they perceive to be a more appropriate placement, and whose judgment is wholly or in part vindicated ... should receive more than an 'empty victory.'" *Alamo Heights Indep. School Dist. v. State Bd. of Educ.*, 790 F.2d 1153, 1161 (5th Cir.1986), *citing Burlington School Comm.*, 471 U.S. at 370, 105 S.Ct. at 2003. Nonetheless, the burden rests on the Tices to show that the Blue Ridge Center was a proper placement for their son's special educational needs.

claim for reimbursement of Matthew's hospital expenses, the district court held that the hospitalization, because it was necessitated by Matthew's short-term psychiatric needs rather than any educational need, was a unreimbursable medical expense. This finding of fact is supported by the record. There is no persuasive evidence that Matthew's educational and emotional disabilities, either before or after his nervous breakdown, were so severe that hospitalization was necessary to provide him with a FAPE. As the Supreme Court has noted, the medical services exclusion "was designed to spare schools from an obligation to provide a service that might well prove unduly expensive and beyond the range of their competence." *Irving Indep. School Dist. v. Tatro,* 468 U.S. 883, 892, 104 S.Ct. 3371, 3377, 82 L.Ed.2d 664 (1984) (endorsing Secretary of Education's interpretation). This reasoning certainly controls here, and, for all practical purposes, appellants conceded the point at oral argument. To require Botetourt County to bear the costs of this short-term hospitalization and the attendant medical services would be an unjustified expansion of the School Board's liability and would reach a result beyond the Act's purpose. This conclusion, however, does not end our inquiry.

 While hospitalized, Matthew also received services which very well may have been "special education and related services." The Act contemplates provision of a FAPE to hospitalized students in its definition of "special education," 20 U.S.C. § 1401(a)(16). Further, the term "related services" includes psychological and counseling services. 20 U.S.C. § 1401(a)(17).

Thus, the educational services Matthew received at the Blue Ridge Center, and much of the counseling he received while hospitalized, may be recoverable even though the medical expenses during the hospital stay are not.[12] Consequently, if appellants can show that Matthew was not receiving a FAPE when these services were rendered and that their placement of Matthew was proper under the Act, then to the extent the Tices can show that expenses incurred during the hospitalization were incurred for educational services,[13] those expenses are subject to reimbursement. *See Doe v. Anrig,* 651 F.Supp. 424, 430–32 (D.Mass. 1987) (granting reimbursement of educational expenses incurred during a psychiatric hospitalization while denying reimbursement for the hospitalization itself).[14]

## VI

In sum, we vacate only that portion of the district court's order denying reimbursement of expenses appellants incurred during Matthew's December 1986 hospitalization. We remand for further factual findings as to whether Matthew's placement during this period was proper under the Act. If the district court so finds, it then should determine which expenses were incurred for special education and related services and order reimbursement of those expenses only.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS

**12.** This is true even though Roanoke Valley did not separate the medical and educational services when it billed the Tices. This fact does not compromise the Tices' right of reimbursement, it merely complicates their burden of proof.

**13.** This determination necessarily must turn on the nature and purpose of the services rather than the identity of the service provider. We reject the School Board's argument that Dr. Gray's status as a physician means that any services he provides are, *ipso facto,* medical services. As the Ninth Circuit recently recognized in *Clovis Unified School Dist. v. California Office of Admin. Hearings,* 903 F.2d 635 (1990), such an arbitrary classification ignores reality.

*See also Max M. v. Thompson,* 592 F.Supp. 1437, 1445 (N.D.Ill., E.D.1984) (otherwise reimbursable psychotherapy remains reimbursable even if supplied by a psychiatrist).

**14.** The Ninth Circuit's recent decision in *Clovis* is not to the contrary. There the school district admitted its responsibility to provide a FAPE while the child was hospitalized and contested only its liability to pay for the hospitalization itself. *Id.* at 639. Also, because the issue was not raised, the court did not reach the issue whether educational and medical expenses may be separated and reimbursed accordingly. *Id.* at n. 3.