Elliott CONE, on behalf of Elliott Hamilton CONE, III, Nancy Cone, on behalf of Elliott Hamilton Cone, III, Plaintiffs,

v.

RANDOLPH COUNTY SCHOOLS, Defendant.

No. 1:02 CV 1018.

United States District Court, M.D. North Carolina.

Feb. 6, 2004.

Sharon Bey Christopher, Harley Bey Christopher, PLLC, Durham, NC, for plaintiffs.

Donna R. Rascoe, Cranfill Sumner & Hartzog, Raleigh, NC, for defendant.

*MEMORANDUM OPINION*

OSTEEN, District Judge.

Plaintiff Elliott Cone III ("Elliott"), by and through his parents Elliott and Nancy Cone, brought this action under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* and N.C. Gen.Stat. § 115C–106 *et seq.* (the North Carolina counterpart to the IDEA), challenging Defendant Randolph County Schools' decision to change Elliott's placement from a school in Maryland to one in North Carolina. Plaintiffs also raise claims of discrimination under the IDEA, section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, 42 U.S.C. § 1983, and the North Carolina Persons With Disabilities Protection Act, N.C. Gen.Stat. § 168A–1 *et seq.* Both parties have moved for summary judgment on all of Plaintiffs' claims. For the reasons stated herein, Plaintiffs' motion for summary judgment will be denied and Defendant's motion for summary judgment will be granted.

## I. BACKGROUND

Elliott is a thirteen-year old boy who has been diagnosed with Fragile X Syndrome and other disabilities. He began receiving special education services in the Randolph County Schools ("RCS") in 1993 when he was identified as a student with autism. From 1993 until 1999, Elliott continued to receive services from RCS, except for some brief interruptions. For one month each in 1996 and 1997, Elliott was admitted to Amos Cottage Rehabilitation Hospital in Winston–Salem, North Carolina, to receive treatment for self-injurious and aggressive behavior. Elliott also spent several months in 1997 and early 1998 at the Devereaux Clinic in Florida. From March 1998 until May 1998 Elliott was treated at the Murdoch Center in Butner, North Carolina. Elliott was readmitted to Amos Cottage in August 1999 and remained there until February 2000.

As Elliott was approaching the end of his last stay at Amos Cottage, meetings were held to determine an appropriate placement for him. Ultimately, the parties involved in these meetings (including Elliott's parents, representatives of RCS, and state mental health officials) concluded that no appropriate residential placement was available in North Carolina. An individualized educational program ("IEP") was developed whereby Elliott was placed at the Benedictine School for Exceptional Children ("Benedictine") in Ridgley, Maryland. Benedictine is a school for children with developmental disabilities ages five to 21. The education portion of Elliott's fees at Benedictine was paid by RCS, while state mental health agencies paid his residential expenses. Elliott enrolled at Benedictine in March 2000. A second annual IEP developed in February 2001 (covering the period from March 2001 until February 2002) maintained Elliott's placement at Benedictine.

In the spring of 2001, state mental health officials identified an in-state residential program that they believed was potentially appropriate for Elliott and encouraged RCS officials to investigate. This program, known as "PATH" (Partners in Autism Treatment and Habilitation), is located at the Murdoch Center in Butner, North Carolina, where Elliott had previously been treated. In June 2001, RCS initiated the first of three IEP meetings regarding a potential placement at PATH. At the first meeting, the Cones raised concerns about the appropriateness of the PATH program. RCS officials gathered additional information and a second meeting was held to discuss the new information as well as concerns expressed by some of Elliott's medical providers re-

garding his ability to handle a change in placement. At the third and final meeting in July 2001, a decision was reached, over the Cones' objections, to amend Elliott's IEP by changing his placement to PATH.

The Cones challenged the change in Elliott's placement through the administrative procedures set up by the state of North Carolina. An administrative law judge ("ALJ") heard their appeal of the changed placement decision at various times throughout the spring of 2002. After consideration of witness testimony and documentary evidence, the ALJ issued an opinion on August 16, 2002, concluding that Elliott's placement at PATH was procedurally and substantively flawed, and was inappropriately tainted by influence from persons outside the IEP process. *See* Final ALJ Decision, Conclusions of Law ¶¶ 13–14, 19–20. RCS appealed the decision to a state hearing review officer, who reversed the ALJ and found for RCS. On November 22, 2002, Plaintiffs filed this action seeking review of the decisions below and stating additional claims.[1]

## II. DISCUSSION

### A. Standard of Review

■ Generally, summary judgment is appropriate where an examination of the pleadings, affidavits, and other proper discovery materials before the court demonstrates that there is no genuine issue of material fact, thus entitling the moving party to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where a motion for summary judgment is made in an IDEA case, it "may more aptly be described ... as a motion for summary

adjudication." *Hanson ex rel. Hanson v. Smith*, 212 F.Supp.2d 474, 480 (D.Md. 2002). In conducting this adjudication, courts must make an independent decision based on the evidence presented while giving "due weight" to the proceedings below. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982); *G. ex rel. R.G. v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 302 (4th Cir.2003). The burden of proof, however, falls on the party challenging the administrative findings. *Barnett ex rel. Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 152 (4th Cir.1991).

### B. Plaintiffs' Individuals with Disabilities Education Act Claim

■ The IDEA was enacted "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living." 20 U.S.C. § 1400(d)(1)(A); *see also id.* § 1412(a)(1)(A) (making states that provide a free appropriate education to disabled children eligible for federal funds). The requisite free appropriate public education is to be provided by the means of an IEP. *Rowley*, 458 U.S. at 181, 102 S.Ct. at 3038; *Tice ex rel. Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1203 (4th Cir. 1990).

The IDEA also requires states that receive IDEA funds to "establish and maintain procedures ... to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of free appropriate public education." 20 U.S.C. § 1415(a). If a parent objects to the identification,

---

1. Elliott remains at Benedictine to the present and will remain there until the final resolution of this matter. *See* 20 U.S.C. § 1415(j).

placement, or evaluation of his or her child, the state must provide an impartial due process hearing. *Id.* § 1415(f)(1). At that hearing, the parent has the right to be accompanied by counsel, to present evidence and cross-examine witnesses, and to receive a written record of the hearing and the decision made. *Id.* § 1415(h)(1)-(4). After the hearing (or the appeal if an appeals process exists at the state level), an aggrieved party may bring an action in a district court, which is empowered to grant appropriate relief based on the preponderance of the evidence. *Id.* § 1415(i)(2)(A), (i)(2)(B)(iii).

■ In reviewing a state administrative proceeding in an IDEA case, federal courts apply a two-step inquiry. First, the court must decide whether the state complied with the IDEA's procedural requirements. *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3051; *see also Tice*, 908 F.2d at 1206 (holding that a state's failure to comply with the procedural requirements of § 1415 can be adequate grounds to conclude that a school district failed to provide a free appropriate public education). If the state did comply with the procedural requirements, the court must decide whether the IEP is "reasonably calculated" to enable the child to receive educational benefits. *Rowley*, 458 U.S. at 206-07, 102 S.Ct. at 3051. If both requirements are met, "the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207, 102 S.Ct. at 3051. As noted above, courts reviewing state IDEA administrative proceedings must make an indepen-

dent decision based on the evidence presented while giving "due weight" to the proceedings below. *Id.* at 206, 102 S.Ct. at 3051; *G. ex rel. R.G. v. Fort Bragg Dependent Sch.*, 343 F.3d 295, 302 (4th Cir. 2003).[2]

**1. Procedural Requirements**

■ Plaintiffs point to two primary procedural errors that allegedly denied Elliott a free appropriate public education. Echoing the ALJ, Plaintiffs first argue that the summer 2001 IEP meetings failed to involve all of the necessary parties, thus preventing RCS from obtaining all the information relevant to Elliott's IEP. *See* Final ALJ Decision, Conclusions of Law ¶¶ 21–25.

The IDEA requires that an IEP team be composed of the parents, at least one regular education teacher (if the child is or may be participating in regular education), at least one special education teacher, a qualified representative of the local educational agency, an individual who can interpret evaluation results, the child (when appropriate), and, at the discretion of the parents or agency, other individuals with knowledge regarding the child. 20 U.S.C. § 1414(d)(1)(B). In this case, the summer 2001 IEP meetings involved the parents, a special education teacher, a representative of RCS, and Benedictine staff. (Tr. ALJ Hr'g vol. 12 at 248–49.) There is no suggestion that it was appropriate for Elliott to attend the meetings, nor was a regular education teacher necessary since Elliott was not being considered for placement in a regular educational environment. Eval-

---

**2.** This court possesses no expertise or clairvoyance concerning appropriate decisions of an educational authority, and such is not required. It is the duty of this court to determine whether proper legal safeguards are employed by the educational authority in arriving at a decision which has such a vital impact upon the person for whom the decision

is made. If such safeguards are followed, then the court may not substitute its own belief or inclinations for the decision of those who ultimately make the important educational decisions based upon their specialized training and the authority granted by Congress.

uation results were also not at issue, so there was no need for an evaluation interpreter to attend. The only remaining category of potential participants are those that might be invited at the discretion of the parents or the local education agency. *See* § 1414(d)(1)(B)(vi). The ALJ noted that there were no representatives of PATH or the state mental health department present at the summer 2001 IEP meetings. Final ALJ Decision, Conclusion of Law ¶ 21. Specifically, the ALJ chided RCS for "failing to have all critical parties at the table for discussion." *Id.* ¶ 25.

There is no evidence, however, that any statutorily required parties were absent. To the extent that PATH or mental health representatives would have offered assistance and information at the IEP meeting, they could have been invited by either the Cones or RCS under the discretionary category of § 1414(d)(1)(B)(vi). *See* 34 C.F.R. § 300.344(c) (placing the determination of who is qualified to be invited as a discretionary member of the IEP team in the hands of the inviting party).

Even to the extent that PATH representatives could have provided information relevant to Elliott's placement, much of that information was available to the IEP team. The evidence shows that Carol VonCannon and Pam Wolfe, two representatives of RCS, visited the PATH site, gathered information, and concluded that PATH was comparable to Benedictine and would meet Elliott's IEP goals. (Tr. ALJ Hr'g vol. 2 at 233, 243.) The court concludes that no procedural violation has occurred since all statutorily-required persons were part of the IEP team, especially where the IEP team had access to the information any non-required parties might have provided. *See Briley v. Board of Educ. of Baltimore County,* 87 F.Supp.2d 441, 444 (D.Md.1999).

Plaintiffs also note that the attendance and ultimate result of the summer 2001 IEP meetings were markedly different from those of the February 2001 IEP meeting. The ALJ made similar findings. *See* Final ALJ Decision, Finding of Fact ¶ 29, Conclusion of Law ¶ 23. The earlier meeting was attended by the parents, an RCS representative, a special education teacher, various representatives of Benedictine, and a mental health professional. The fact that the earlier meeting was better attended and reached a more amicable conclusion does not, however, mean that the summer 2001 meetings violated the IDEA. As noted above, all of the necessary parties were present.

■ Plaintiffs further suggest that the brief interval between the February 2001 IEP meeting and the summer 2001 IEP meeting somehow indicates that the second IEP process was flawed. IEPs must be reviewed at least once a year. *See* 34 C.F.R. § 300.343(c). Moreover, "if either a parent or a public agency believes that a required component of the student's IEP should be changed, the public agency must conduct an IEP meeting if it believes that a change in the IEP may be necessary to ensure the provision of [a free appropriate public education]." 34 C.F.R. pt. 300, appx. A. Here, once RCS received information about the potential placement for Elliott in the PATH program, it had an obligation to conduct an IEP meeting to review the potential placement. *See id.; see also* N.C. Gen.Stat. § 115C–110(a) (requiring local education agencies to "explore available local resources and determine whether the services are currently being offered by an existing public or private agency"). By conducting the summer 2001 IEP meetings, no matter how close in time they were to the February 2001 meeting, RCS was fulfilling its duty to consider potential changed placements.

■ Finally, contrary to the conclusion of the ALJ, *see* Final ALJ Decision, Conclusion of Law ¶ 24, the Cones were not denied adequate participation in the IEP decision making process. IDEA regulations require that local educational agencies "ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate." 34 C.F.R. § 300.345(a). The evidence shows that the Cones attended and participated in all three of the summer 2001 IEP meetings conducted by RCS. The Cones participated in discussions regarding why PATH was considered an appropriate environment and the possible harm to Elliott from moving to a new placement. (Tr. ALJ Hr'g vol. 13 at 6–8.) These facts demonstrate to the satisfaction of the court that the Cones were not denied the opportunity to participate in the IEP meetings.

■ In their second primary argument, Plaintiffs, again echoing the ALJ, argue that the PATH placement was unilaterally imposed on Elliott by individuals outside the IEP process. For example, in March 2001, Carol VonCannon, director of the Exceptional Children Program of RCS, received a letter from Linda Griffin of the North Carolina Division of Mental Health, Developmental Disabilities, and Substance Abuse Services (the "Division") indicating that the PATH program had been identified as an option for Elliott and stating that "we believe having Elliott served in North Carolina would be better for both him and his family." (Admin. Record Pls.' Ex. 47.) The letter went on to invite VonCannon to visit PATH in an effort to determine whether Elliott's needs could be met there. Plaintiffs also received a letter from Patricia Porter, the head of the Developmental Disabilities Section of the Division. This letter reiterated the Division's intention to continue to provide services for Elliott, but noted that it was operating under financial constraints that made it necessary to consider alternative forms of support for Elliott. (*See id.* Pls.' Ex. 50.) The Cones also received a letter from Carmen Hooker Buell, the Secretary of Health and Human Services, which stated, "[w]e look forward to providing services to your son at the PATH Program." (*Id.* Pls.' Ex. 51.) Finally, on June 7, 2001, Plaintiffs received a letter from Arthur Robarge and Patricia Porter indicating that the Division would no longer be providing funding for support services offered at Benedictine. (*Id.* Pls.' Ex. 56.) Instead, the Division offered to provide its services at the PATH program. (*Id.*)

Based on these letters, the ALJ concluded that persons outside the IEP process had unilaterally changed Elliott's educational placement without following the procedures set forth by the IDEA. *See* Final ALJ Decision, Conclusions of Law ¶¶ 18–20. In particular, the ALJ noted that the writers of the above letters were not present at the February IEP meeting and did not consider information regarding the appropriateness of a continued placement at Benedictine. *See id.*

The ALJ's conclusions, however, were in error. Neither the Division nor the Department of Health and Human Services ("DHHS") was the agency responsible for Elliott's educational placement or the provision of free appropriate public education. That responsibility lies with RCS, the local educational authority of the county wherein the Cones reside. *See* N.C. Gen.Stat. § 115C–110(i) ("Each local educational agency shall provide free appropriate special education and related services in accordance with the provisions of this Article for all children with special needs who are residents of, or whose parents or guardians are residents of, the agency's dis-

trict."). North Carolina retains the distinction between educational services, which are outlined in the form of an IEP and provided by the local educational agency, and additional disability services, outlined in habilitation plans designed by the DHHS. *See Burke County Bd. of Educ. v. Denton ex rel. Denton,* 895 F.2d 973, 983 (4th Cir.1990); *see also* N.C. Gen. Stat. § 115C–113(f) (requiring that where DHHS provides services, the IEP and the habilitation plan must be "coordinated, integrated, and internally consistent"). Rather than changing Elliott's educational placement, the letters from the Division and DHHS changed only the support services they provide. For example, the March 23, 2001, letter from Griffin to Von-Cannon indicates the Division's interest in placing Elliott at PATH, but invites Von-Cannon to "visit and review the PATH program to determine whether you think his educational needs can be met there." (Admin. Record Pls.' Ex. 47.) The March 27, 2001, letter from Porter distinguished between the services provided by RCS and the services provided by the Division. Finally, the June 7, 2001, letter from Robarge and Porter indicates that a local developmental disability agency, and not the Division, would take over responsibility for providing support services for Elliott if the Cones did not agree to move Elliott from Benedictine to PATH. The letter specifically notes the Cones' option to leave Elliott at Benedictine, demonstrating that the letter does not represent a unilateral change in educational placement. Moreover, even if one views these letters as forcing a new educational placement on Elliott, the court cannot ignore the fact that undisputed evidence shows that RCS did conduct three IEP meetings after the Cones had received these letters, and that the meetings were conducted in a manner consistent with the procedures outlined in the IDEA.

In line with the above discussion, the court concludes that RCS did comply with the procedural requirements of the IDEA.

2. Substantive Requirements

 As noted above, once a reviewing court concludes that the procedural requirements of the IDEA have been met, it must next determine whether the IEP is "reasonably calculated to enable the child to receive educational benefits." *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 207, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). This standard does not, however, invite the court to "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Id.* at 206, 102 S.Ct. at 3051. Thus courts "should be reluctant indeed to second-guess the judgment of education professionals" in deciding on an IEP and should not disturb an IEP simply because the court "disagree[s] with its content." *Tice ex rel. Tice v. Botetourt County Sch. Bd.,* 908 F.2d 1200, 1207 (4th Cir.1990).

 The relatively modest "reasonably calculated" standard of *Rowley* does not require a school district to maximize a handicapped child's potential, but merely mandates that the IEP provide some educational benefit. *A.B. ex rel. D.B. v. Lawson,* 354 F.3d 315, 325–26 (4th Cir.2004); *Burke County Bd. of Educ. v. Denton ex rel. Denton,* 895 F.2d 973, 980 (4th Cir. 1990). When a state, however, imposes a greater substantive requirement, the federal court must review the placement under the more stringent standard. *See Burke County,* 895 F.2d at 982. North Carolina's counterpart to the IDEA declares that the state's policy is to "ensure every child a fair and full opportunity to reach his full potential" and to "provide a free appropriate public education to every

child with special needs." N.C. Gen.Stat. § 115C–106(a), (b). These policies have been interpreted as placing a higher burden[3] on local educational authorities to "eliminate the effects of the handicap, at least to the extent that the child will be given an equal opportunity to learn if that is reasonably possible." *Harrell v. Wilson County Sch.*, 58 N.C.App. 260, 264, 293 S.E.2d 687, 690 (1982) (quoting *Rowley*, 458 U.S. at 215, 102 S.Ct. at 3055 (White, J., dissenting)); *accord Burke County*, 895 F.2d at 983. The heightened North Carolina standard does not, however, require local educational authorities to develop a "utopian educational program for handicapped students." *Harrell*, 58 N.C.App. at 265, 293 S.E.2d at 691.

■ In determining the educational placement of a child covered by the IDEA, its implementing regulations require a local educational authority ("LEA") to ensure that the placement is based on the child's IEP, is as close as possible to the child's home,[4] and that consideration is given to potential harmful effects from the placement.[5] 34 C.F.R. § 300.552(b), (d). The child's IEP is the most important consideration, as it "forms the basis for the placement decision." 34 C.F.R. pt. 300, appx. A.

The evidence in this case shows that the goals of Elliott's IEP can be accomplished at the PATH program. Kim Jones, the project director for PATH, testified that she had reviewed Elliott's IEP and found that, in terms of his goals and needs, he was comparable to students presently being served at PATH. (Tr. ALJ Hr'g vol. 10 at 1542–43.) Moreover, Jones testified that many of Elliott's IEP objectives were already being carried out at PATH for other students on a daily basis. (*Id.*) Indeed, during her testimony Jones went through the IEP page-by-page and stated that the goals and objectives listed therein could be implemented at PATH. (*Id.* at 1545–51.) Jones also noted that any objec-

---

**3.** One court has noted that it is somewhat surprising that the North Carolina provisions are read to impose a higher burden than the IDEA since one of the stated purposes of the state act is to "bring State law, regulations and practice into conformity with relevant federal law." *C.M. ex rel. J.M. v. Board of Educ. of Henderson County*, 85 F.Supp.2d 574, 595 (W.D.N.C.1999) (quoting N.C. Gen. Stat. § 115C–106(b)).

**4.** It is undisputed in this case that the PATH program is closer to Elliott's home than Benedictine. Mrs. Cone stated that she viewed Elliott's placement closer to home as "irrelevant" since it was not a problem for the Cones to drive six hours to visit Elliott. (Tr. ALJ Hr'g vol. 13 at 6–7.) The regulations make clear, however, that proximity to the student's home is not irrelevant. *See* 34 C.F.R. § 300.522(b)(3). Nonetheless, because the appropriateness of educational services provided is more important than mere proximity, the court will treat PATH's relative closeness to Elliott's home as only one factor in favor of placement at PATH. *See Barnett ex*

*rel. Barnett v. Fairfax County Sch. Bd.*, 927 F.2d 146, 153 (4th Cir.1991).

**5.** The IDEA additionally imposes a "least restrictive environment" requirement mandating that:

> To the maximum extent appropriate, children with disabilities ... are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This requirement expresses Congress's strong policy preference for mainstreaming when it would be appropriate for a child. *DeVries v. Fairfax County Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989). There is no suggestion in this case, however, that mainstreaming is appropriate for Elliott, so the court will not further address this requirement.

tives that were not currently being performed by any PATH students could be added to meet Elliott's needs. (*Id.* at 1546–47.)

Two other PATH staff members also testified that PATH could address the objectives of Elliott's IEP. Teresa Kersey, PATH's classroom teacher, went through Elliott's IEP while testifying and indicated that she could provide the services necessary to address the goals of the IEP. (*Id.* vol. 11 at 28–35.) In addition, PATH's psychologist, Doug Irvin, testified that he had reviewed Elliott's IEP and concluded that the goals therein could be appropriately addressed at PATH. (*Id.* at 189–90.)

Defendant also offered the testimony of Dr. Gary Mesibov, an expert in the areas of autism and developmental disabilities. (*Id.* vol. 16 at 18.) Dr. Mesibov reviewed Elliott's IEP and visited the PATH program. (*Id.* at 42–43.) Based on Elliott's IEP, Dr. Mesibov concluded that the PATH program had the structure to meet the IEP's goals. (*Id.* at 43.) Moreover he testified that PATH was appropriate for Elliott and that "it was developed with students with [Elliott's] kinds of educational needs in mind." (*Id.* at 38.)

Plaintiffs presented the testimony of Nancy McCloy, Benedictine's educational director, and Judith Cornette, who coordinated clinical services provided for Elliott at Benedictine. Both women provided lengthy testimony on Elliott's progress at Benedictine. There is no doubt that the progress Elliott made at Benedictine was substantial. McCloy testified that she strongly disagreed with Elliott's proposed placement at PATH, particularly in light of the significant progress he had made at Benedictine. (*Id.* vol. 8 at 1058–59.) McCloy also expressed concerns about the fact that stays in PATH are generally limited to two years, as well as the newness of the program. (*Id.* at 1060–61.)

She did, however, acknowledge that she had never visited the PATH program but had read literature about it. (*Id.* at 1177.)

Plaintiffs' expert witness, Dr. Ave Lachiewicz, visited the PATH program and talked with its director. (*Id.* vol. 15 at 86–87.) Dr. Lachiewicz testified that she was concerned that PATH would focus on the autism aspects of Elliott's needs but not his Fragile X concerns, because PATH had no specific experience with Fragile X. (*Id.* at 90–91.) Dr. Lachiewicz also noted concerns due to PATH's relative newness and the short-term nature of the PATH program. (*Id.* at 92–95.) In giving her testimony, however, Dr. Lachiewicz did not review Elliott's IEP. (*Id.* at 144.) Thus, despite her misgivings about PATH, Dr. Lachiewicz was unable to testify as to its appropriateness in terms of Elliott's IEP, one of the primary determinants of Elliott's placement.

Plaintiffs also presented letters from several doctors who had treated Elliott. These letters lauded the progress Elliott had made at Benedictine and expressed concern over his ability to handle a transition from Benedictine to PATH. For example, Dr. William Hickling wrote that Elliott "may suffer irreversible harm" if transferred to PATH, and that any loss in function may never be recovered. (Admin. Record Pls.' Ex. 61.) Dr. Marybeth C. Myers wrote that Benedictine was the "ideal" setting for Elliott and that he would suffer "irrevocable damage" if moved to PATH. (*Id.* Pls.' Ex. 62.) Dr. Gail Spiridigliozzi noted Elliott's "tremendous accomplishment[s]" at Benedictine and concluded that "[i]t is possible that Elliott would never regain the positive behaviors and skills acquired at Benedictine" should he be moved to PATH. (*Id.* Pls.' Ex. 63.) Dr. Kurt L. Klinepeter also noted the progress Elliott had made at Benedictine. (*Id.* Pls.' Ex. 64.)

Nancy McCloy also expressed her concerns that a transition to PATH might harm Elliott, particularly in light of the difficult transitions he had experienced before being placed at Benedictine. (Tr. ALJ Hr'g vol. 8 at 1062.) Judith Cornette described the skills Elliott had acquired at PATH as "fragile" and voiced concern regarding the harm Elliott might experience if he is moved from Benedictine. (*Id.* vol. 9 at 1361.)

In all of the evidence presented by Plaintiffs, however, little attention appears to have been paid to Elliott's IEP. Dr. Spiridigliozzi, for example, testified that she had seen Elliott's IEP, *id.* vol. 15 at 227–28, but noted that her letter was based primarily on information provided by the Cones. (*Id.* at 218.) None of the other three letters reference Elliott's IEP or discuss whether it could be implemented successfully at PATH. Certainly, the harmful effects of a new placement must be considered, *see* 34 C.F.R. § 300.522(d), but the IEP should be the starting place from which a placement is measured. *See* 34 C.F.R. pt. 300, appx. A (noting that the IEP "forms the basis for the placement decision"). A decision maker could determine from the evidence presented and by its greater weight that Elliott's IEP can be implemented at PATH.

Moreover, the testimony of Pam Wolfe, Elliott's special education teacher from RCS, indicates that the IEP team did consider the letters from Elliott's doctors as well as information regarding Elliott's progress at Benedictine. (Tr. ALJ Hr'g vol. 2 at 234.) Wolfe also testified that, based on her experiences with Elliott, he would have only "short-lived" difficulty in transitioning from one placement to another. (*Id.* Vol. 1 at 59.) A similar concern had been expressed when Elliott was transferred from Amos Cottage to Benedictine. (*Id.* at 57; Admin. Record

Def.'s Ex. 8.) Despite this concern, Elliott's first status report from Benedictine notes that he was "adjusting well to his new school." (Tr. ALJ Hr'g vol. 1 at 83; Admin. Record Def.'s Ex. 26.) Similarly, Elliott experienced a difficult transition into the Extended School Year program at Benedictine his first summer there, but within a few weeks he was calmer and more accepting of staff instructions. (Tr. ALJ Hr'g vol. 1 at 90; Admin. Record Def.'s Ex. 27.)

Taken as a whole, there is little doubt that Elliott made substantial progress at Benedictine. It is also apparent that Elliott will have some problems with a transition to PATH, although it appears that these problems will be overcome as Elliott acclimates to the new placement. Despite some concerns about the PATH program, the evidence demonstrates that Elliott's IEP can be successfully implemented there. This conclusion is a central factor in determining that PATH is an appropriate placement for Elliott because the IEP "forms the basis for the placement decision." 34 C.F.R. pt. 300, appx. A. The court concludes that Elliott's placement at PATH is "reasonably calculated" to enable him to receive educational benefits. *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 206–07, 102 S.Ct. 3034, 3051, 73 L.Ed.2d 690 (1982). The PATH placement also provides Elliott with a "fair and full opportunity to reach his full potential." N.C. Gen. Stat. § 115C–106(a). For these reasons, the court finds no substantive error in Defendant's decision to place Elliott at PATH.

Having concluded that Defendant's decision to place Elliott at PATH complied with both the procedural and substantive requirements of the IDEA, "the State has complied with the obligations imposed by Congress and the courts can require no

more." *Rowley,* 458 U.S. at 207, 102 S.Ct. at 3051. Defendant's motion for summary judgment is therefore granted as to Plaintiffs' claims under the IDEA and N.C. Gen.Stat. § 115C–106 *et seq.*

### C. Plaintiffs' Other Claims

In addition to their claims under the IDEA and its state law analog, Plaintiffs also assert numerous other claims against RCS. Despite the fact that both parties have moved for summary judgment on all claims, Plaintiffs have offered no arguments or evidence in support of their motion for summary judgment or in opposition to Defendant's motion on any of these additional claims. Even when, as here, a defendant's motion for summary judgment is unopposed, the court must still review the motion to determine whether the moving party is entitled to judgment as a matter of law. *Custer v. Pan Am. Life Ins. Co.,* 12 F.3d 410, 416 (4th Cir.1993).

Plaintiffs first assert a claim of discrimination under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.* The standards for determining violations of both of these acts are the same. 29 U.S.C. § 794(d); *Myers v. Hose,* 50 F.3d 278, 281 (4th Cir.1995). Proving discrimination in the educational context requires "something more than a mere failure to provide the 'free appropriate education' required by [the IDEA]." *Sellers ex rel. Sellers v. School Bd. of the City of Manassas,* 141 F.3d 524, 529 (4th Cir.1998) (quoting *Monahan v. Nebraska,* 687 F.2d 1164, 1170 (8th Cir.1982)). In the context of the education of handicapped children, "either bad faith or gross misjudgment" must be shown in order to prove a violation of the Rehabilitation Act or the ADA. *Id.* (quoting *Monahan,* 687 F.2d at 1171). Here, Plaintiffs have not

presented, and the court has not found, any evidence of bad faith or gross misjudgment on the part of RCS. Absent such a showing, Plaintiffs' claims under the Rehabilitation Act and ADA fail as a matter of law.

Plaintiffs also assert a claim of discrimination under the IDEA. Unlike the ADA and the Rehabilitation Act, the IDEA was intended to redress inappropriate educational placement decisions, not discrimination. *See Sellers,* 141 F.3d at 528; *Hornstine v. Township of Moorestown,* 263 F.Supp.2d 887, 901 (D.N.J.2003). No part of the IDEA addresses discrimination. Discrimination claims by disabled children are properly brought under the ADA or Rehabilitation Act, not the IDEA. *See Hornstine,* 263 F.Supp.2d at 901–02. As such, summary judgment must be granted in favor of Defendant on Plaintiffs' claim for discrimination under the IDEA.

Plaintiffs also attempt to make a claim under 42 U.S.C. § 1983. In *Smith v. Robinson,* the Supreme Court held that suits could not be maintained under § 1983 for violations of the IDEA's predecessor when that statute provided its own relief. 468 U.S. 992, 1013, 104 S.Ct. 3457, 3469, 82 L.Ed.2d 746 (1984). Congress amended the IDEA, however, to overrule much of *Smith*'s holding limiting suits in addition to IDEA claims. *See* 20 U.S.C. § 1415(*l*) ("Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990, title V of the Rehabilitation Act of 1973, or other Federal laws protecting the rights of children with disabilities...."). The Fourth Circuit has since held, however, that where § 1415(*l*) mentions "other" federal statutes, it must not be read to include § 1983, "a statute which speaks generally and mentions neither disability nor youth." *Sellers,* 141

F.3d at 530. Thus the court held that § 1415(*l* ) permits suits under § 1983 for constitutional violations, but not for IDEA violations. *Id.* The court went on to note that even if a constitutional claim is raised, the plaintiff would be obligated to prove that the discrimination was purposeful and, because the disabled are not a suspect class and education is not a fundamental right, that the local educational authority acted without a rational basis. *Id.* Here, Plaintiffs' complaint does not suggest that they are raising a constitutional violation with their § 1983 claim, but even if they were, summary judgment would be appropriate because there is no evidence before the court suggesting purposeful discrimination or that RCS acted without a rational basis. Thus summary judgment must be granted in favor of Defendant on Plaintiffs' § 1983 claim.

 Lastly, Plaintiffs assert a claim of discrimination in violation of the North Carolina Persons With Disabilities Protection Act ("NCPDPA"), N.C. Gen.Stat. § 168A–1 *et seq.* The NCPDPA creates a cause of action for a person with a disability who is aggrieved by a discriminatory practice as defined in the act. *Id.* § 168A–11(a). Among other things, it is a discriminatory practice for a state agency to "refuse to provide reasonable aids and adaptations necessary for a known qualified person with a disability to use or benefit from existing public services." *Id.* § 168A–7. Claims under the NCPDPA, however, are limited in that

> [n]o court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under Section 503 or Section 504 of the Vocational Rehabilitation Act of 1973 ... or the Americans with Disabilities Act of 1990 ... involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter.

*Id.* § 168A–11(c); *McCullough v. BB & T Co.,* 35 F.3d 127, 130 (4th Cir.1994) (holding that the NCPDPA "specifically prohibit[s] concurrent jurisdiction under it and the Rehabilitation Act"). Thus courts will dismiss a plaintiff's claims under the NCPDPA when they arise out of the same facts as a claim under the Rehabilitation Act or ADA. *See Gottesman v. J.H. Batten, Inc.,* 286 F.Supp.2d 604, 615 n. 7 (M.D.N.C.2003). Here, as in *Gottesman,* Plaintiffs' claim under the NCPDPA arises from the same facts and circumstances as their ADA and Rehabilitation Act claims, and as such fails as a matter of law.

## III. CONCLUSION

For the reasons stated herein, Plaintiffs' motion for summary judgment is denied and Defendant's motion for summary judgment is granted.

A judgment in accordance with this opinion will be filed contemporaneously herewith.

## JUDGMENT

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment [11] is granted and Plaintiffs' Motion for Summary Judgment [14] is denied.